## O. C. BOYD v. O. MILLS.

1. CONSTITUTIONAL LAW—*Qualifications of*Electors*. That part of § 2 of article 5 of the constitution of this state, as amended in 1867, which reads, "No person who has ever voluntarily borne arms against the government of the United States, or in any manner voluntarily aided or abetted in the attempted overthrow of said government, except all persons who have been honorably discharged from the military service of the United States since the first day of April, A. D. 1861, provided that they have served one year or more therein, shall be qualified to vote or hold office in this state until such disability shall be removed by a law passed by a vote of two-thirds of all the members of both branches of the legislature," does not conflict with § 10, article 1, of the constitution of the United States, and is a valid constitutional provision.

2. SAMPLE BALLOTS, *Voted by Mistake, When Rightly Counted.* Where the election officers of a township were furnished by the county clerk with official ballots printed on white paper, and also with sample ballots printed on colored paper, in a separate package, and where by mistake the sample ballots were used by all the voters of that township, and the official ballots on white paper were all returned unused by the judges of election, and the election in such township was conducted regularly in every other respect, and the ballots used by the electors of all political parties were of the same color, *held,* that such ballots were rightly counted.

*Original Proceeding in Quo Warranto.*

ALL the material facts of this case are stated in the opinion herein, filed June 9, 1894.

*E. Sample*, and *Chester I. Long*, for plaintiff.

*Martin & McNeal*, and *Frank Doster*, for defendant (on motion to strike out two portions of the petition as irrelevant):

1. If a man has voluntarily borne arms against the government of the United States, or voluntarily aided or abetted in the attempted overthrow of said government, has he not been guilty of the offense of treason? See *Huber v. Reily*, 53 Pa. St. 112. The supreme court of Pennsylvania declared a law passed by congress, making every man a deserter who refused to enroll under a requisition of the President of the United States after proper notice, and visiting him with disqualification to vote or hold office as a punishment, to be highly penal. Mr. Justice Field, in the case of *Cummings v. The State of Missouri*, 71 U.S. 332, quotes with approval the English and French writers, who state that to deprive a man of the right to vote or hold office by bill of attainder is punishment. Also, on this subject, see, *Gotchens v. Matheson*, 58 Barb. 152. So, then, if we consider the bill of rights of our own state and the constitution of the United States, and give to the words used in our constitution, in § 2 of article 5, their usual signification, we must conclude that to disfranchise for voluntarily bearing arms against the government of the United States is a punishment inflicted for the commission of a crime.

It may be answered, if this is punishment for a crime, then it is also punishment to declare that no person shall be eligible to the office of president of the United States unless he was born within the United States, or that no person under a certain age shall be allowed to hold office. Our reply to this argument is, that it is no punishment to withhold the right of suffrage or the right to hold office from one who has never enjoyed that right; but the provision of our constitution under consideration strikes down a right that has been enjoyed by the very men against whom it is aimed, and is clearly intended as a punishment.

Our next contention is, that subjecting a man to disfranchisement in a *quo warranto* proceeding is depriving him of a right without due process of law. Due process of law, as defined by the supreme court in case of *The State v. Whisner*, 35 Kas. 277, "means law in its regular course of administration, according to the prescribed forms, and in accordance with the general rules for the protection of individual rights;" also citing, in support of this definition, *Hurtado v. The People*, 110 U. S. 516; *Walker v. Souvinet*, 92 id. 90, 93.

If it be held that § 2 of article 5 of the constitution is not open to the objections heretofore urged in this brief, but is a legitimate attempt on the part of the people to regulate the right of suffrage, and that said section is self-executing, then we urge that it is a bill of attainder. Bills of attainder are laws enacted which, for a past offense, stain or taint the persons against whom they are enacted by a forfeiture of their civil or political rights, without the right of trial by jury, in due form of law. See *Cummings v. The State of Missouri*, 71 U. S. 332; Cooley, Const. Lim. 315. Now, to this it may be answered that the people may have the right to put into their constitution and enforce that which, if enacted into statute, might be considered a bill of attainder. Our reply to that answer is, that the people have no more power to put a bill of attainder into the constitution of their state than the legislature would have to enact one into law; and in support of this we cite 129 U. S. 36, L. P. C. & Co.'s edition; also, *Calder v. Bull*, 3 U. S. 386; and in defense of the positions heretofore taken, we cite *Rison v. Farr*, 24 Ark. 161.

2. We contend that §§ 14, 15, 22, and 25, of the late election law, lay down the rules by which an official ballot may be identified by election judges, and that any ballot found in the ballot box containing these marks of identity is entitled to be counted as an official ballot, regardless of its color. The *facsimile* of the signature of the county clerk enables the election judges to know that the ballot is official; and, up to the time that the ballot reaches the hand of the elector from the election judge, there is nothing that the elector can do or

say as to the color of the paper, or as to what indorsements shall be placed thereon. He could not vote, if he would, any other ballot that that handed to him by the election judge; and, although he knows that a ballot is not on pure white paper, if he wishes to vote at the election, he is compelled to vote it, unless the judge sees fit to hand him some other ballot. Hence, our contention is, that the provisions of our statute relating to the preparation of the ballot, from the time it is prepared for the printer by the county clerk until it reaches the voter, are mandatory only as to the election officers, and directory merely as to the voter. In other words, the voter cannot be disfranchised by any mere mistake of the election officers. In support of this, we cite *Bowers v. Smith,* 111 Mo. 45. See, also, *The State v. Saxon,* 30 Fla. 668; *The State, ex rel., v. Van Camp,* 54 N. W. Rep. (Neb.) 114; *Linstrom v. Board of Commissioners,* 54 id. (Mich.) 280; 60 Am. Dec. 769; McCr. Elect. 304; 11 Am. Rep. 767; *Allen v. Glynn,* 17 Colo. 338, 31 Am. Rep. 304; *The State, ex rel., v. Russell,* 51 N. W. Rep. 465; *The State v. Walsh,* 25 Atl. Rep. 1; *Parvin v. Wimberg,* 30 N. E. Rep. 790; *Kirk v. Rhoads,* 46 Cal. 398; *Wildman v. Anderson,* 17 Kas. 344, 350.

*E. Sample,* and *Chester I. Long,* for plaintiff:

1. The right of suffrage is not a natural right, nor is it an absolute, unqualified personal right. It is a right derived in this country from constitutions and statutes. It is regulated by the states, and their power to fix the qualifications of voters is limited only by the provisions of the fifteenth amendment to the constitution, which forbids any distinction on account of "race, color, or previous condition of servitude." McCr. Elect., § 3.

The above proposition clearly states the position of the plaintiff upon the first part of defendant's motion to strike out.

If it be possible to separate the valid from the invalid in a statute, part of it may be declared unconstitutional and the rest of it be permitted to stand. As only one portion of

§ 2 of article 5 of the constitution is in controversy in this action, we will confine our attention solely to that, and not discuss the validity of the provisions that have no relation to this case.

That the proposition above announced is the law of this country, has been settled for many years by the decisions of the supreme court of the United States, and by different state courts, and it is unnecessary to discuss or attempt to prove it. The following authorities are cited in its support: *United States v. Cruikshank*, 92 U. S. 542; *United States v. Reese*, 92 id. 214; *Ex parte Yarborough*, 110 id. 651, 4 Sup. Ct. Rep. 152; *Minor v. Happersett*, 21 Wall. 162; *Stone v. Smith*, 34 N. E. Rep. (Mass.) 521; *Sproule v. Fredericks*, 11 S. Rep. (Miss.) 472; *United States v. Anthony*, 11 Blatchf. 200.

The above authorities, in addition to many others, fully substantiate the doctrine that any regulation, condition or restriction that the state may see fit to impose upon electors is constitutional and valid, unless it violates the provisions of the fifteenth amendment.

A man has an inherent vested right to carry on any peaceable or lawful avocation without interference by the government, and any law that compels him to do certain acts before he can continue his usual avocation is unconstitutional. A man, however, has no inherent, vested right in voting; it is a political right that may be extended to those who do not now possess it, or it may be taken from those who now exercise the privilege. The attention of this court is specially directed to the case of *Blair v. Ridgely*, 41 Mo. 63, and the very able briefs of counsel in that case upon the same questions that are directly involved in this. See, also, *Burch v. Van Horn*, 2 Cong. Elec. Cas. 205; *Murphy v. Ramsey*, 5 Sup. Ct. Rep. 747; *Green v. Shumway*, 39 N. Y. 418; *Kring v. The State*, 107 U. S. 221, 2 Sup. Ct. Rep. 443.

It is not a punishment to deprive a person of the right of suffrage after it has once been granted. Cooley's Constitutional Limitations, § 589, says:

"Participation in the elective franchise is a privilege, rather

than a right, and it is granted or denied upon grounds of general policy."

See, also, *Anderson v. Baker*, 23 Md. 531; *Blair v. Ridgely*, 41 Mo. 63; *Shepherd v. Grimmett*, 31 Pac. Rep. (Idaho,) 793.

2.  The provisions of § 14, chapter 78, of the Laws of 1893, in regard to the official ballot, are mandatory, and, if not followed, the ballots cannot be counted.

The question to be determined by this court, upon the motion to strike out of the petition all of the allegations in regard to the vote of Deerhead township, is, whether the provisions of the Australian ballot law, in regard to the form and color of the official ballot, are mandatory or directory.   Section 14 provides that the ballot shall be on *plain white* paper, and the allegations in the petition are that the 100 official ballots sent to Deerhead township by the county clerk were returned unused, and that 20 *colored* ballots were voted instead.   We insist that the provisions of the Australian ballot law, recently adopted in Kansas, are so plain and direct that this court will have no difficulty in determining the question presented.  See *Fitzpatrick v. Gebhart*, 7 Kas. 35; *Jones v. The State, ex rel.*, 1 id. 273; *Comm'rs of Shawnee Co. v. Carter*, 2 id. 115; 6 Am. & Eng. Encyc. of Law, p. 348; *Talcott v. Philbrick*, 59 Conn. 478, 20 Atl. Rep. 436; *Field v. Osborne*, 21 id. 1070; *Parvin v. Wimberg*, 30 N. E. Rep. 790; *Kirk v. Rhoads*, 46 Cal. 399; *The People v. Board of Canvassers*, 129 N. Y. 395; *West v. Ross*, 53 Mo. 350; *Oglesby v. Sigman*, 58 Miss. 502; *Reynolds v. Snow*, 67 Cal. 497, 8 Pac. Rep. 27.

In the case of *The State v. McKinnon*, 8 Ore. 493, it was decided that a ballot printed or written upon colored paper, in violation of a statute requiring it to be printed on plain white paper, was void. See, also, *Mize v. McElroy*, 11 S. Rep. 133; *The State v. Saxon*, 12 id. 218; *The State v. Connor*, 23 S. W. Rep. 1103.

It is alleged in the petition that the 100 official ballots sent to this precinct were returned unused, and that the sample ballots, provided by § 15, were voted instead.   We insist that these provisions of our ballot law are mandatory, and

that the 19 votes cast in Deerhead township for sheriff should not be counted. Five of these were cast for Boyd and 14 for Mills. The canvassing board found that Boyd had received 508 votes and Mills 516. From the vote of Boyd should be deducted these 5 votes, leaving him 503. From the vote of Mills should be deducted the 14 votes cast in Deerhead township, and the 13 votes cast for him by those who were not qualified voters by reason of § 2, article 5, of the constitution of this state, leaving him 489 votes, without considering any other allegations of our petition.

The opinion of the court was delivered by

ALLEN, J.: This is an original proceeding instituted in this court by O. C. Boyd, as plaintiff, to try the right to the office of sheriff of Barber county. The petition shows that, at the election held on the 7th day of November, 1893, according to the official canvass of the votes cast, the plaintiff received 508 and the defendant 516 votes. The plaintiff alleges that many illegal votes were cast and counted for the defendant, and that the plaintiff received a majority of the legal votes. The questions now presented arise on a motion by the defendant to strike out two portions of the petition, which, it is claimed, are irrelevant. The first is as follows :

"That the following-named persons voted at the general election held on the 7th day of November, 1893, for the defendant, O. Mills, for sheriff, in the townships set opposite their respective names, they not being qualified electors at said election, by reason of § 2, article 5, of the constitution of the state of Kansas, each and all of them having voluntarily borne arms against the government of the United States, and voluntarily aided and abetted in the attempted overthrow of said government, and their disabilities have not been removed by a law passed by two-thirds of all the members of both branches of the legislature of the state of Kansas,"

with a list of names and residences of persons claimed to be disqualified.

I. Counsel for the defendant challenges the validity of that clause of the state constitution which deprives persons who

have voluntarily borne arms against the government of the United States of the right to vote. The section in which this provision occurs is § 2 of article 5. The section originally read as follows: "Sec. 2. No person under guardianship, *non compos mentis,* or insane, shall be qualified to vote, nor any person convicted of treason or felony, unless restored to civil rights." In 1867 the section was amended, and now reads as follows:

"Sec. 2. No person under guardianship, *non compos mentis,* or insane; no person convicted of felony, unless restored to civil rights; no person who has been dishonorably discharged from the service of the United States, unless reinstated; no person guilty of defrauding the government of the United States, or any of the states thereof; no person guilty of giving or receiving a bribe, or offering to give or receive a bribe, and no person who has ever voluntarily borne arms against the government of the United States, or in any manner voluntarily aided or abetted in the attempted overthrow of said government, except all persons who have been honorably discharged from the military service of the United States since the 1st day of April, A. D. 1861, provided that they have served one year or more therein, shall be qualified to vote or hold office in this state until such disabilities shall be removed by a law passed by a vote of two-thirds of all the members of both branches of the legislature."

It is contended that this section of the constitution, having been passed after the close of the war, is in the nature of a bill of attainder, imposing the penalty of disfranchisement without a trial, and is *ex post facto* in its operation. The leading cases cited as supporting this contention are *Cummings v. Missouri,* 71 U. S. 277, and *Ex parte Garland,* 71 id. 333. The question presented in those cases was not identical with the one in this. The constitution of Missouri, as revised and amended in 1865, provided a test oath, by which a person was required to swear that he had never been guilty of any manner of disloyalty to the government of the United States, and that, after the expiration of 60 days after the taking effect of the constitution, no person should be permitted to practice as an attorney or counselor at law, or be competent

as a bishop, priest, deacon, minister, elder or other clergyman of any religious persuasion, to teach or preach, unless such person should have taken and subscribed the prescribed oath. Cummings was a Roman Catholic priest, and was prosecuted for teaching and preaching without having taken the required oath. The supreme court of the United States held the provisions of the Missouri constitution invalid. A similar question was presented under an act of congress in the Garland case, which was decided at the same time. The question in the latter case arose under an act of congress prohibiting any person from being admitted to the bar of the courts of the United States without taking a similar oath. The court held, in both these cases, that the requirements were invalid, and were in the nature of bills of attainder; that they operated to deprive these men of the right to earn a livelihood by pursuing the callings for which they had been educated; that the requirement of such oaths in effect required them to condemn themselves; and that the constitution of Missouri and the act of congress, in effect, condemned all persons as guilty, and prohibited them from following their callings until they should establish their innocence by expurgatory oaths. The following cases also are cited: *Green v. Shumway*, 39 N. Y. 418; *Huber v. Reily*, 53 Pa. St. 112; *Dent v. West Virginia*, 129 U. S. 115; *Rison v. Farr*, 24 Ark. 161.

It is ably and earnestly argued in this case, that to deprive a person of the right to vote is a punishment; that the right to vote and hold those offices which can only be filled by persons having the qualifications of electors is a valuable right; and that any law, whether in the form of legislative enactment or constitutional provision, which is retroactive in its operation and takes away this right, is in its nature a bill of attainder, inflicting penalties, and that it must be declared void under the federal constitution. It is answered, however, that the right to vote and hold office is not a natural right; that suffrage is nowhere universal, but always restricted by age, sex, and other incidents; that of necessity the organic law must prescribe the qualifications of electors, and that, in doing

so, the framers are subject to absolutely no restrictions, but
may confer or withhold the right at pleasure.

The question appears to the writer not free from difficulty.
The privileges of citizenship are certainly esteemed as of great
value.   To be deprived of them is to suffer the infliction of an
injury; yet to say that the people in their organic law may not
determine who shall participate in the government, is to deny
a power universally and necessarily exercised by the framers
of every constitution.   For the courts to assume the function
of sitting in judgment, not merely under the constitution, but
upon the constitution itself, and according to their own views
declare what provisions are valid and what invalid, is a most
serious undertaking; yet, of course, provisions of the consti-
tution of the state, if framed in violation of an expressed pro-
hibition by the federal constitution, must be held inoperative.

In determining who shall exercise the right of suffrage,
may not the people exclude classes who have shown them-
selves unfaithful to a public trust, or who have engaged in
hostilities against either the state or the federal government?
Counsel argue that the offense which is made the ground of
disfranchisement is an offense against the sovereignty of the
United States, not against that of the state of Kansas at all,
and that only that sovereignty against which the offense has
been committed can punish for the crime.   This question,
however, is immaterial until it be determined that the provi-
sion in the constitution is in the nature of a punishment for
crime.   If it be so, the provision would be invalid, no matter
whether the offense be against the state or the United States,.
for it would be *ex post facto* in its operation.

It will be observed that the original section of the consti-
tution disqualified persons for offenses only after conviction,
while the amended section disqualifies persons convicted of
felony, and also those guilty of defrauding the government
or any of the states thereof, or giving or receiving a bribe, as
well as those who have voluntarily borne arms against the
government.   In view of the fact that this provision has re-
mained in the constitution for 26 years, and that at nearly

every session of the legislature acts have been passed remov-
ing the disqualifications of voters, that the validity of the
provision has remained unchallenged, and has been accepted
as the organic law of the state by the people generally, the
court certainly should hesitate to overturn that which has
been so long established and so universally recognized. The
weight of authority, if not of reason, also seems to sustain
the validity of the constitutional provision. (*Anderson v. Ba-
ker*, 23 Md. 531; *Shepherd v. Grimmett*, 31 Pac. Rep. [Idaho,]
793; *United States v. Cruikshank*, 92 U. S. 542; *Ex parte
Yarborough*, 110 U. S. 651; *Minor v. Happersett*, 21 Wall.
162; *Stone v. Smith*, 34 N. E. Rep. 521; McCr. Elect., § 3.)

The only constitutional question we now have to decide is,
whether the people of the state of Kansas had the right to
incorporate this provision in their organic law,
and this question is answered in the affirmative.
A conviction for treason, under the constitution as
it stood before the amendment, would carry with it the loss
of citizenship. The amendment adds nothing to the punish-
ment for the offense. We have here no requirement of test
oaths to consider. The character of evidence required to es-
tablish the disqualification of a voter under this provision is
not now presented, nor do we express any opinion upon the
subject.

1. Constitutional
law—qualifi-
cations of
electors.

II. Defendant also moves to strike out the following por-
tion of the petition:

"That on the 3d day of November, 1893, F. A. Lewis,
as clerk of Barber county, Kansas, issued and gave to S. Y.
Carr, judge of the election of Deerhead precinct, 100 official
ballots; that on the 8th day of November, 1893, 100 official
ballots, unused, from Deerhead precinct were returned by
John Rentfrew; that on the said 8th day of November,
1893, as shown by the records in the office of the county
clerk of said Barber county, there were voted in said Deer-
head township 20 colored ballots; that a true and correct
copy of the record of official ballots issued for the election
held on the 7th day of November, 1893, for Deerhead town-
ship, as the same appears in the office of the county clerk of

Barber county, Kansas, is made a part of this petition, here referred to, hereto attached, and marked 'Exhibit A'; that on the 4th day of November, 1893, the county clerk of Barber county, Kansas, took a receipt from S. Y. Carr, judge of election of Deerhead precinct, for 100 official ballots, a true and correct copy of which is attached to this petition, made a part hereof, and here referred to, and marked 'Exhibit B'; that on the 8th day of November, 1893, the county clerk of Barber county, Kansas, took a receipt from John Renfrew, of Deerhead voting precinct, for 100 ballots, unused, and for 20 colored ballots voted, which said receipt, as it appears in the stub book of the county clerk of Barber county, Kansas, is in the words and figures set forth in 'Exhibit C,' which said exhibit is hereto attached, here referred to, and made a part of this petition.

"The said plaintiff further says, that the returns of the election on file in the office of the county clerk of Barber county, Kansas, on the 10th day of November, 1893, show that no official ballots had been voted in Deerhead precinct, and that ballots other than white had been voted in said Deerhead precinct, and that ballots having distinguishing colors and marks thereon had been voted in said Deerhead precinct; that no legal or official ballots were cast in Deerhead precinct for any candidate for the office of sheriff or other office, at the general election held on said 7th day of November, 1893; that the five votes cast for O. C. Boyd, and the 14 votes cast for O. Mills, shown by the returns to have been cast in Deerhead precinct, were illegal and void, and should not be counted, for the reasons above set forth."

Section 14, chapter 78, of the Laws of 1893, known as the Australian ballot law, contains the provision that "the ballots shall be on plain white paper through which the printing or writing cannot be read." Section 15 provides that "ballots shall be printed and in the possession of the officers charged with their distribution at least five days before the election, accompanied by exact copies of said ballots printed on paper of any color other than white, for the inspection of candidates and their agents." It appears from the petition that in Deerhead township the election officers used the sample ballots printed on colored paper, and returned all the official ballots, which were printed on white paper. It is conceded that all

of the ballots used in Deerhead township were of the same color, and the sole question with reference to their legality arises from the color of the paper. It is contended on behalf of the plaintiff that the statute is mandatory, and that no ballot can be counted unless it conforms strictly to the requirements of the law; that the court is not at liberty, by construction, to do away with any of its requirements. In this contention, we think counsel for the plaintiff is in the main correct, and that the wholesome provisions of the law are neither to be disregarded nor construed away. Section 25 contains the following provision:

"If a voter marks more names than there are persons to be elected to an office, or fails to mark the ballot as required by other section of this act, or if for any reason it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for such office. No ballot without the official indorsement shall be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provision of this act shall be counted."

That the ballots in fact used were printed and furnished by the county clerk, and were in all respects the same as the official ballot, excepting the color of the paper, is conceded, and it is also conceded that the ballots used in the one township were uniform in color. Does this fact operate to render the election at that voting precinct a nullity? In considering the statute, we are to keep steadily in mind the evident purpose of the legislature in its enactment. It is plain that among the most prominent ends sought to be attained was that of absolute secrecy. Any mark or distinguishing feature on the ballots which would enable a person other than the voter himself to identify the ballot, and find out how the elector had voted, was intended to be strictly prohibited.

The case of *The People, ex rel., v. Board of Canvassers*, 129 N. Y. 395, is relied on. The statute of New York differs materially from our own. The law requires that "on the back of each ballot shall be printed in type known as great primer Roman condensed capitals the indorsement, 'official

ballot for,' and after the word 'for' shall follow the designation of the polling place for which the ballot is prepared, the date of the election, and a *facsimile* of the signature of the county clerk; the ballot shall contain no caption or other indorsement except as in this section provided." In distributing the ballots, those printed for the republican party were transposed so that the votes indorsed with the number of the first district in certain towns were sent to the second, and those with the second to the first, and such transpositions occurred in four towns and at nine election precincts. The twenty-ninth section of the New York act provided:

"No inspector of election shall deposit in the ballot box on election day any ballot which is not properly indorsed and numbered, except in the cases provided for in § 21 of this act, nor shall any inspector of election deposit in the ballot box or permit any other person to deposit therein on election day any ballot that is torn, or that has any other distinguishing mark on the outside thereof."

It seems that separate tickets are printed there for each political party, instead of printing all the names on one ballot. In deciding the case, the court lays much stress on the fact that the republican ballots, being indorsed with the wrong number, had distinguishing marks by which they could be identified, and that the secrecy of the ballot was thereby destroyed, and also on the positive requirements of the law, that no ballat should be deposited unless properly indorsed and numbered. In the case of *The State v. McKinnon*, 8 Ore 493, a ballot was rejected, written on colored paper, the law requiring it to be on plain white paper. We should have no hesitancy in saying that a single ballot printed on colored paper, where the official ballots printed on white paper were being used by other electors, could not be counted. In that case it would be plain that the object of the law was contravened.

We have examined the numerous cases cited by counsel for the plaintiff, and from them deduce two rules, which seem to be steadily adhered to by the courts: (1) That, under laws similar to our own, designed to preserve the secrecy of the ballot, any

·mark or distinguishing feature apparent on the ballot renders it void. (2) Where the law is explicit in prohibiting the counting of any ballot which does not conform to the requirements of the statute, that the courts will enforce the law as it reads, without interposing their own judgment as to the reasonableness or unreasonableness of the requirements.

. It will be observed that the law nowhere explicitly provides that a ballot printed on paper of a color other than white shall not be counted. The only clause which could be held to imply such a provision is, that "none but ballots provided in accordance with the provisions of this act shall be counted." Among the requirements of the act, which are very minute, is one that the official ballots shall be put up in separate lots, packages of 50 ballots each, with certain marks on the outside. Will it be contended that an error in counting the ballots within any package, or in marking or addressing the package intended for any person, would vitiate the election? The departure from the law in matters which the legislature has not declared of vital importance must be substantial, in order to vitiate the ballots. This appears to be the general current of all the authorities. In *Bowers v. Smith*, 111 Mo. 61, it is said:

· "If the law itself declares a specified irregularity to be fatal, the courts will follow that command, irrespective of their views of the importance of the requirement. In the absence of such declarations, the judiciary endeavor as best they may to discern whether the deviation from the prescribed forms of law had or had not so vital an influence as to prevent a full and free expression of the popular will. If it had, the irregularity is held to vitiate the entire return; otherwise, it is considered immaterial."

In *The State, ex rel., v. Russell*, 51 N. W. Rep. (Neb.) 465, it was held: "The provisions in § 20 of the code, approved March 4, 1891, known as the Australian ballot law, for the marking of ballots with ink, is directory only, for ballots in other respects regular will, in the absence of fraud, be counted, although marked with a pencil." Under the Indiana election law of 1889, the poll clerks were required to write their

initials in ink in the lower left-hand corner on the back of each ballot. In one precinct, clerks, by an honest mistake, put the indorsement in the lower right-hand corner on all the ballots, and it was held, in the case of *Parvin v. Wimberg*, 30 N. E. Rep. 790, that the ballots were properly counted. We have not overlooked the case of *Talcott v. Philbrick*, 59 Conn. 472, cited by plaintiff's counsel, with the reasoning in which we are not satisfied. A distinction also was made by the supreme court of Michigan in the case of *Lindstrom v. Board of Canvassers*, 54 N. W. Rep. 280, between those errors or mistakes of officials which would have the effect to disfranchise a class of voters and a disregard of the provisions of the law by the electors themselves.

Without proceeding to review at greater length the authorities cited by counsel on both sides of the question, we conclude that the mere fact that the paper on which all the ballots used in one election district was of a color other than white, where the ballots were not only printed by the authorities designated by law, and by them furnished to the judges of election, but were furnished by the judges to the voters, and were the only ballots furnished to or used by any voter at that voting place, is not sufficient to prevent the counting of the votes. The secrecy of the ballot has been in no wise impaired; the voters themselves have manifested no disposition to disregard the law, and it may be fairly inferred that the use of the colored ballots was an honest mistake on the part of the judges of the election. Had a part of the ballots been white and a part colored, so as to afford some grounds for identification of the votes cast by the individual electors, a different question would be presented. We reach the conclusion that the law has not been substantially infringed, because we are unable to see how the purposes of the act can have been impaired in any degree by the mistake made in using the colored ballots. By this decision we do not intend to say that any of the provisions of the law may be disregarded, or that any

2. Sample ballots, voted by mistake, when rightly counted.

39—53 KAS.

officer may escape liability to punishment for violating any of its provisions.

The first part of the motion will be overruled, and the last part will be sustained.

All the Justices concurring.