## SLAYMAKER v. PHILLIPS.

ELECTIONS—MANDATORY STATUTES—ENDORSEMENT OF OFFICIAL BALLOT — VOID BALLOTS — CONSTITUTIONAL LAW — CONSTRUCTION OF STATUTES.

1.  The statute prohibiting the counting of any ballot which is not indorsed by the official stamp and has not the name or initials of the judge of election written . thereon, is mandatory.  (L. 1890, Ch. 80, Sec. 130.)  (Groesbeck, C. J., dissenting.)

2. The statute requires both the official stamp and the name or initials of a judge of election indorsed upon a ballot to make it valid, and the absence of either will cause its rejection. (Groesbeck, C. J., dissenting.)

3. Either the name or initials of the judge may be used. Both are not required.

4. The official stamp and the name or initials of a judge of election must appear upon the exterior of the ballot when it is folded, after having been prepared by the elector, so as to conceal the tickets it bears upon its face.

5. Such indorsement of the ballot is the legal and best means of identifying it as the identical ballot which was furnished to the elector, and of certifying to the latter that it is official. (Groesbeck, C. J., dissenting.)

6. The legislature has the power to define and prescribe what shall constitute a lawful ballot, and to enact that none but lawful ballots shall be received and counted. (Groesbeck, C. J., dissenting.)

7. The statutory requirement that the elector shall fold his ballot so that the indorsement may be seen implies that he shall look for such indorsement. If he neglects that duty, and, in consequence thereof, loses his vote, he has no cause for complaint. (Groesbeck, C. J., dissenting.)

8. Courts should hesitate long before declaring an act of the legislature invalid, or unreasonable to the extent of being unconstitutional, and then should not do so unless such conclusion is unavoidable and necessary.

9. In case of apparent conflict between statutory and constitutional provisions they should be harmonized if possible.

10. There is no conflict between the constitution and the statute invalidating a ballot not containing the required indorsements. Such statute is a reasonable, constitutional and efficient exercise of the legislative duty to pass laws to secure the purity of elections, guard against abuses of the elective franchise, and make the secrecy of the ballot compulsory. (Groesbeck, C. J., dissenting.)

11. The statute is not unconstitutional either because its enforcement will result in the rejection of ballots cast by persons possessing the constitutional qualifications of electors. (Groesbeck, C. J., dissenting.)

12. Section 130, Chap. 80, Laws 1890, is not in conflict with Section 131, which regulates the canvass of the votes by the election officers. (Groesbeck, C. J., dissenting.)

[Decided July 1, 1895. Rehearing denied December 6, 1895.]

RESERVED QUESTIONS from the District Court of Converse County, HON. RICHARD H. SCOTT, Judge.

This was an election contest, and was tried to the district court without a jury. The court found the facts in the case, and then reserved certain questions to the Supreme Court for its decision. Samuel Slaymaker and Arthur W. Phillips had been opposing candidates for the office of clerk of the district court at the election held in November, 1894. The findings of fact were as follows:

"And the court, having heard all the evidence, and the arguments of counsel, and being sufficiently advised, does say and find for the plaintiff, and that on November sixth, A. D. 1894, a general election was had in the County of Converse, in the State of Wyoming, for the purpose, among other things, of electing a clerk of the district court for said county, for the term of two years, commencing on the seventh day of January, A. D. 1895; that at the time of said election, and for more than one year theretofore, the plaintiff and defendant were, and ever since then have continued to be, residents and qualified electors of said county; that at said election the plaintiff and defendant were opposing candidates and nominees for election to the office of clerk of the district court of said county, for the term aforesaid; that the plaintiff and defendant respectively had been theretofore duly and regularly nominated as candidates for said office at said election, by the county conventions of their respective political parties, held in said county, and the said nominations had been duly and regularly certified, made, signed, authenticated and verified as provided by law, which said certificates of nomination had been duly and regularly filed in the office of the county clerk of said county, at and within the time required by law, and the names of the plaintiff and defendant were duly and regularly printed as such candidates and nominees for said

office upon the official ballots prepared for and used at said election; that at said election votes were cast for the plaintiff and defendant, respectively, and for no other person, for said office, in each of the voting precincts in said county, and the said votes after being canvassed and counted by the judges and clerks of election, at the several precincts, were certified, returned and transmitted to the county clerk of said county; that thereafter, and on the 19th day of November, A. D. 1894, all of the returns of said election in said county had been received by the county clerk thereof, and on said day, the same being within fifteen (15) days after the close of said election, the said county clerk, taking to his assistance two justices of the peace of his county, one of whom was of a different political party than himself, did proceed to open and canvass the returns of said election in said county, and to make abstracts of the votes, in the manner provided by law, and did complete such canvass on that day, and did then, and on the said 19th day of November, A. D. 1894, find and declare from said returns that the said plaintiff had received four hundred and eighty-five (485) votes at said election, for the said office of clerk of said district court, and that the said defendant had received four hundred and eighty-eight (488) votes for said office; and did then further find and declare that the defendant had received the highest number of votes for said office, and had been duly elected thereto, and thereupon the county clerk of said county did make out and deliver unto the defendant a certificate certifying the defendant's election to said office."

"And the court further finds that at said election there were in said county, in addition to others, three voting precincts designated as Voting Precinct No. 11, in Election District No. 3, commonly known as 'Royston's Ranch Precinct,' Voting Precinct No. 26, in Election District No. 2, commonly known as 'Gray's Ranch Precinct,' and Voting Precinct No. 13, in Election District No. 5, commonly known as 'Duck Bar Precinct.'

"That in the said 'Royston's Ranch Precinct,' at said election, the plaintiff received two (2) votes for said office of clerk

of the district court, and the defendant received six (6) votes for said office; at the said 'Gray's Ranch Precinct' the plaintiff received nine (9) votes for said office, and the defendant received fourteen (14) votes for said office; and in the said 'Duck Bar Precinct' the plaintiff received eleven (11) votes for said office; thus making a total of twenty-two (22) votes for the plaintiff in said three precincts for said office, and a total of forty-six (46) votes for the defendant for said office in said three precincts."

"And the court further finds that in the said precincts, and each of them, the judges of election therein at said election, wholly failed and neglected to write the name or initials of any of said judges of election upon the back, or upon any other portion of any of the ballots used or voted thereat, and wholly failed and neglected to write any name or initial upon the back, or upon any other portion, of any of said ballots."

"And the court further finds the judges of election in said 'Gray's Ranch Precinct' and in said 'Duck Bar Precinct,' and each of them, at said election, wholly failed and neglected to print on the back of any of the ballots used or voted thereat any stamp or device designating such ballots as 'Official Ballots,' or indicating the name or number of the voting precinct, or in any other respect containing the designating or identifying matter required by law, or any other matter whatsoever, though they did stamp upon the face, at the head of each of said ballots, such device."

"And the court further finds that the judges and clerks of election at each of said precincts treated as lawful and valid all of the ballots voted thereat, and did canvass and return as valid all of said ballots, thereby apparently giving to the plaintiff and defendant, respectively, the number of votes hereinbefore named, and that if said ballots and votes had not been counted, the plaintiff would have received four hundred and sixty-three (463) votes in said county at said election, for the office of clerk of the district court therein; and the defendant would have received only four hundred and forty-two (442) votes at said election, for said office; and by reason thereof the plaintiff would have received the highest number

of votes for said office, and would have been elected thereto."

The reserved questions are stated in the opinion.

*Lacey & Van Devanter*, for plaintiff.

Any ballot which is not endorsed by the official stamp is void and should not be counted. It is also void and should not be counted if it has not the name or initials of a judge of election. (Laws 1890, pp. 174, 175, secs. 130, 119, 122, and 128.) The absence of either one invalidates the ballot. The language is positive, and the statute is mandatory. (McCrary on Elect., sec. 190; State v. Chandless (N. J.), 29 Atl., 322; Ellis v. May, 99 Mich., 538; Aego v. Stoddard, 136 Ind., 700; State v. Connor, 86 Tex., 133; Atty. Gen. v. McQuade, 94 Mich., 439; People v. B'd, 129 N. Y., 395; People v. B'd, 135 N. Y., 522; State v. Walsh, 62 Conn., 260; Baxter v. Ellis, 111 N. C., 124; Spurgin v. Thompson, 37 Neb., 39; Bechtel v. Albin, 134 Ind., 193; In re Ballot marks, 18 R. I., 822; Parvin v. Wimberg, 130 Ind., 561; Curran v. Clayton, 86 Me., 42; Whittam v. Zahoric (Ia.), 59 N. W., 57; Kearns v. Edwards (N. J.), 28 Atl., 723; In re Vote marks, 17 R. I., 812; State v. Hilmantel, 21 Wis., 566; State v. Stumpf, 23 id., 630; In re Elect. of McD., 105 Pa. St., 488.)

*Robert W. Breckons*, for defendant.

Without denying the claim that the statute is mandatory, counsel for defendant contended and argued that section 130 of the election laws does not require or authorize the rejection of all ballots which have not on them both the official stamp and the initials of the judge; but that if when a ballot is handed to the judges to be deposited, it can be identified in any manner as the ballot previously handed to the voter by the election officers, the purpose of the act is accomplished; and cited (Const., Art. VI, Sec. 11; par. 18, sec. 174, chap. 80, L. 1890). The provisions relating to the preparation of ballots were enacted to secure to a voter the right to exercise his franchise freely and without the interference of any other person. The section (130) should be construed in the light of the objects and purposes to be accomplished. It does not

require both the stamp and initials to permit a ballot to be counted. The section can be construed to mean that if either the stamp or initials be found on a ballot, it may be counted. The policy of the law is that no voter shall be deprived of his right of suffrage by reason of any neglect or breach of duty on the part of an election officer. (McCrary, sec. 192; Jones v. State, 1 Kan., 273; Gilliland v. Schuyler, 9 id., 569; Paine on Elect., sec. 373; People v. Schermerhorn, 19 Barb., 540; People v. Cook, 8 N. Y., 67; Thompson v. Ewing (Pa), 1 Brewst., 107.) The words "or" and "and" may be used by courts interchangeably. (46 Ia., 670; 65 N. C., 342; 77 id., 35.)

CONAWAY, JUSTICE.

This is an election contest. Plaintiff and defendant were candidates for the office of clerk of the district court for Converse County, and defendant had a majority of the votes cast, counted and returned for the office. Plaintiff contests, however, that the ballots cast at the three voting precincts in the county were illegal and void, and should not have been counted, and were counted contrary to express provisions of our statute. If the votes of these precincts were rejected, plaintiff would be elected.

The alleged illegality in the ballots cast at these three precincts consisted in their not having the name or initials of either of the judges of election upon the back or upon any part of any of the ballots, and in two of the precincts none of the ballots were endorsed with the official stamp, though the stamp was placed upon the face of the ballots at the head of the ballots.

Upon these facts the district court reserves for our decision the following important and difficult questions:

"1. Are the provisions of the election laws of Wyoming which require that the judge of election, before delivering any ballot to an elector, shall print on the back of the ballot the designation 'Official Ballot,' and the other words provided by said laws, and that one of said judges shall write his name

or initials upon the back of each ballot, directory only, or are they mandatory?

"2. Should any of the ballots cast at said election at either of the above named precincts be rejected, and, if so, which of said ballots should be so rejected?

"3. Upon the facts aforesaid, should judgment be entered for the plaintiff or for the defendant?"

Section 110 of Chapter 80, of the session laws of 1890, provides that the county clerk or clerk of the municipality, in case of a municipal election, shall furnish to the judges of election the proper number of ballots; and provides further that "he shall also deliver to the said judges a rubber or other stamp with ink pad for the purpose of stamping or designating the official tickets as hereinafter provided. Said stamp shall contain the words 'Official Ballot,' the name and number of the polling precinct, the name of the county or municipality as the case may be, and the name and official designation of the clerk who furnishes the tickets."

Section 119 of the same act provides as follows: ·

"At each election the judges of election shall designate two of said judges who shall deliver the ballots to the qualified electors. Before delivering any ballot to an elector the said judge shall print on the back and near the top of the ballot with a rubber or other stamp provided for that purpose the words 'Official Ballot,' and the other words on the said stamp as hereinafter provided, and one of the said judges shall write his name or initials upon the back of each ballot and directly under the official stamp." * * *

Section 130, in so far as it affects the questions before us, provides as follows:

"In the canvass of the votes any ballot which is not endorsed by the official stamp or has not the name or initials of the judge of election, as provided in this act, shall be void and shall not be counted."

There can be no question that this last provision is mandatory. The language that the ballots specified "shall not be counted" requires no construction and admits of none. It seems to be as plain as any words that could be selected.

But counsel contend that the provision may be construed to require the absence of both the stamp and the name or initials of one of the judges in order to make the ballot void. Some room for this idea is furnished by the language of the statute in specifying negatively and disjunctively what defects shall cause the rejection of the ballot, and not putting the provision in the affirmative form of declaring what shall be requisite in the endorsement of a ballot otherwise legal, to authorize it to be counted. If the statute said that a ballot, otherwise legal, should be counted only when it is endorsed by the official stamp or has the name or initials of the judge of election as provided in this act, it would be clear that the presence of either one or the other would authorize the counting of the ballot. But as the provision reads, it is equally clear that the meaning is that the absence of either one or the other shall cause the rejection of the ballot. The name and initials are interchangeable, of course, and both of these are not required. This all seems obvious from a mere inspection of the language, and this disposes of all the points made by counsel for defendant in brief or oral argument.

But one member of this court insists that this is an unreasonable and unconstitutional restriction of the right of suffrage. The majority of the court think differently.

The duty of courts to pass upon the constitutionality of acts of the legislature is, perhaps, the most delicate duty they have to perform. Courts may well hesitate long before declaring an act of the legislature invalid, or unreasonable to the extent of being unconstitutional, and then should not do so unless such conclusion is necessary and unavoidable. The question whether a provision is reasonable or unreasonable is a question primarily for the legislature to decide in enacting the law. And it has been held that it is the duty of the courts to enforce statutory provisions, however unreasonable they may appear. Flint River Steamboat Co. v. Foster, 5 Ga., 194. In case of apparent conflict between statutory and constitutional provisions they should be harmonized if possible. But we find no conflict between the statutory provisions under consideration and the constitution in any of its

provisions. The constitution imposes upon the legislature the duty to pass laws to secure the purity of elections and to guard against abuses of the elective franchise. (Art. 6, Sec. 13.)

Section 11 of the constitution imposes further legislative duties in these words:

"All elections shall be by ballot. The legislature shall provide by law that the names of all candidates for the same office to be voted for at any election, shall be printed on the same ballot, at public expense, and on election day to be delivered to the voters within the polling place by sworn public officials, and only such ballots so delivered shall be received and counted. All voters shall be guaranteed absolute privacy in the preparation of their ballots, and the security of the ballot shall be made compulsory."

Our election law was enacted before the constitution went into effect by the admission of Wyoming as a State, but after the constitution had been adopted by the constitutional convention and ratified by the vote of the people. It was thus as complete an expression of the will of the people as to the character of election law as they desired, and as efficient information to the legislature upon that subject as it was afterwards when it went into effect as the constitution of the State of Wyoming. And the act in question has been left in force ever since without important change, and no change affecting the questions submitted for our decision, as providing the means for carrying these constitutional provisions into effect. This is an emphatic legislative endorsement of these provisions as they stand to-day; and they follow the constitutional provisions very closely.

It will be observed that not a single one of these constitutional provisions is self executing. There could not be an election by ballot without a law providing means for the polling of the vote by ballot. So as to the other provisions. It was and is necessary, and the constitution expressly requires that the legislature shall provide by law for the privacy of voters in preparing their ballots, for the compulsory secrecy of the ballot, that the names of candidates shall be printed

on the same ballot at public expense, and delivered on election day to the voters within the polling place by sworn public officials, and that only such ballots so delivered shall be received and counted. Legislation was and is necessary to provide the public official to deliver the ballots, and to provide the means of identification requisite to carry out the provision that only such ballots so delivered should be received and counted, and to exclude all others.

If we could entertain a doubt as to the correctness of our conclusion, that section 130 of the act of 1890 requires both the official stamp and the name or initials of a judge of the election to make a valid ballot, and that the legislature has not exceeded its authority in enacting the provisions quoted from the act, and that they are not in conflict with the constitution, there are some further considerations which would suffice to remove all doubt. We have examined a considerable number of cases industriously collated by the Chief Justice, and fairly collated without regard to the question of whether they sustain his dissent or not. We have also examined the authorities at hand upon the general question of the authority of legislatures, under constitutions more or less similar to our own, to enact laws resulting in the rejection of illegal ballots, even when involving large numbers of votes, the votes of entire precincts, or districts consisting of a number of precincts, or the validity of an entire election. After such examination we feel safe in announcing the following proposition:

No respectable authority can be found denying the power of the legislature to define and prescribe what shall constitute a lawful ballot; and the further proposition that no respectable authority can be found denying the power of the legislature to enact that none but lawful ballots shall be received or counted. Such provisions our legislature has enacted. The first subdivision of section 164 of the act of 1890 reads:

"No officer shall deposit in the ballot box any ballot except a lawful one. A lawful ballot is an official ballot officially stamped and marked with the initials or name of a judge of

the election, and offered by a qualified elector during the time of election." And the authorities are unanimous to the effect that an illegal ballot will not be counted. If it be considered doubtful whether section 130 requires both the official stamp and the name or initials of a judge of the election upon the ballot, it can not be considered doubtful under section 164. And section 128 of the act provides also that "No judge of election shall deposit in any ballot box any ballot upon which the official endorsement hereinbefore provided for does not appear." The official endorsement is the official stamp with the name or initials of a judge of election written directly under it by himself. The meaning of these three sections taken together is clear. A legal ballot is one with both the official stamp and the name or initials of a judge of the election upon it, no judge of election shall deposit any other ballot in any ballot box, and no other ballot shall be counted. And if any judge of election deposit any other ballot in any ballot box the act is highly penal. The eleventh subdivision of section 164 provides:

"Any officer violating any of the provisions of this section shall be imprisoned in the penitentiary not more than five years and not less than one year, or be fined not more than two thousand dollars and not less than one hundred dollars, or may be both imprisoned and fined as aforesaid, and shall forever thereafter be incapacitated from holding any civil office or of exercising the elective franchise in Wyoming."

The legislature evidently regarded the observance of these provisions as of great importance and made the penalty thus severe.

But the voter has duties to perform supplementary to that of the officers, and the performance of these duties by the voter constitutes an important part of the scheme of the constitution and the statute to secure the purity of elections, to guard against abuses of the elective franchise, and to secure the secrecy of the ballot. And section 165 of the act imposes a severe penalty upon any person upon whom any duty is imposed by the act, "who shall wilfully do or perform any

act by this act prohibited, or who shall neglect or omit to perform any duty imposed by this act."

And the act specifies some things which the elector himself shall do, and some things which he shall not do.

"On receipt of his ballot the elector shall forthwith and without leaving the polling place, retire alone to one of the places, booths or compartments provided to prepare his ballot. He shall prepare his ballot by marking a cross before or after the name of the person or persons for whom he intends to vote." (Sec. 120.)

"No elector other than one who may, because of his disability to read or physical disability, be unable to mark his ballot shall divulge to any one within the polling place the name of any candidate for whom he intends to vote or (to) ask or receive the assistance of any person within the polling place in the preparation of his ballot." (Sec. 127.)

"After preparing his ballot the elector shall fold it so that the face of the ballot will be concealed, and so that the endorsement therein may be seen. He shall then vote forthwith and before leaving the polling place." (Sec. 122.)

What acts of omission or commission will subject the elector to the penalties of section 165 we will not now consider. But we cannot regard the elector who neglects to comply with any of these positive provisions of the statute as blameless, and we think he has no cause of complaint if, in consequence of such neglect, he loses his vote. The positive command of the statute that the elector shall fold his ballot so that the endorsement may be seen implies that he shall look for such endorsement. It cannot be said that it is impossible for him to comply with this requirement when the ballot furnished bears no endorsement. The judges are there with the official stamp. It is little trouble to ask them to endorse the ballot properly. We have no patience to consider the idea that the voters generally have not the intelligence to do this.

We will not speculate as to what presumptions may arise from this neglect of duty by the officers of the three precincts named with the acquiescence of all the voters. But we must

say that the effect of such proceeding is to open the door to fraud and abuses of the elective franchise which the legislature has properly sought to close; and to put it in the power of unscrupulous election officers and their confederates to perpetrate the very frauds and abuses which it is the object of the constitution and the statute to suppress. Such irregularities may occur through negligence in case of a fair election, but we are of opinion they are not likely to.

But these are minor considerations in the discussion of the questions before us. The description of a lawful ballot is plain. The command to the judges to place no other ballot in the ballot box and the provision that any ballot not answering to the description shall not be counted, are plain, imperative and mandatory. The doctrine of all the authorities as to such language in election laws is well summed up in McCrary on Elections at section 190. He says: "The language of the statute to be construed must be consulted and followed. If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute, must so hold, whether the particular act in question goes to the merits or affects the result of the election or not. Such a statute is imperative, and all considerations of its policy or impolicy must be addressed to the legislature."

We are willing to go to the extreme limit of liberal construction in order to save an honest election, or to avoid the loss of votes cast in good faith; but we cannot conceive that it is permissible for this court or any court to set aside positive legislative enactments. The statutes under consideration are too clear in their meaning to require construction. The question is simply whether we will enforce them or not. We are of the opinion that the Supreme Court of Kansas has well stated the correct principles applicable to such cases in Boyd v. Mills, 25 L. R. A., 486, as follows:

"The departure from the law in matters which the legislature has not declared to be of vital importance must be substantial in order to vitiate the ballots."

And the following rule from the same case commands our approval:

"Where the law is explicit in prohibiting the counting of any ballot which does not conform to the requirement of the statute that the courts will enforce the law as it stands without interposing their own judgment as to the reasonableness or unreasonableness of the requirements."

We are of the opinion that the statutory provisions under consideration are reasonable, constitutional and efficient means of the discharge by the legislature of the duty imposed by the constitution to pass laws to secure the purity of elections, to guard against abuses of the elective franchise, and to make the secrecy of the ballot compulsory.

But we are not prepared to give the categorical answer of yes or no to the first question reserved for our decision; neither do the facts of the case call for it. We should be loath to say that a defective stamp not containing all the words required by the statute, used upon all the ballots of a voting precinct, would require the rejection of the vote of the precinct cast at an election fairly and honestly conducted. And the facts of this case do not raise this question. Neither do we decide whether the stamp and the name or initials of a judge of the election must be upon the back of the ballot to authorize its counting. If the stamp and the name or initials of the judge were upon some other portion of the ballot, and the ballot were folded so that this could be seen, but the tickets printed upon the face of the ballot concealed, it might be that this would be a sufficient compliance with the spirit, if not with the letter, of the law, to save the ballot from rejection. This, of course, in the absence of fraud, and when the place of the stamping and the writing of the initials would not be a mark or means of distinguishing the ballot from ballots cast by other persons. But we are of the opinion that the official stamp and the name or initials of a judge of the election must appear upon the exterior of the ballot when it is so folded as to conceal the tickets which it bears upon its face; and if this is not the case, the law must be enforced which prohibits the counting of such ballot. We are inclined

to regard the name or initials of a judge of the election written by himself directly under the official stamp as the statute requires, as the signature of the judge to the words impressed by the stamp; and as the legal means and the best means of certifying to the voter that the ballot is the official ballot of the precinct, and as the legal means and the best means of identification by the judges of the ballot offered and voted by the elector as the identical official ballot furnished to him by the judges of the election.

To the second question we answer that all of the ballots cast at the three precincts named should be rejected.

As to the third question, we are not in position to say whether further proceedings may not lawfully be had prior to judgment. The cause will be remanded for further proceedings in accordance with this opinion.

POTTER, J., concurs; GROESBECK, C. J., dissents.

GROESBECK, CHIEF JUSTICE, dissenting.

By the decision of the majority of this court, the voters of three election precincts of Converse County have been deprived of the right to have the ballots counted as cast by them, through no fault of their own, but simply and solely through the carelessness or inefficiency of the judges of election. These officers were charged by the law, under heavy penalties, with the duty of placing on the back and near the top of the ballots, with a rubber or other stamp provided for that purpose, the designation "Official Ballot" and the name and number of the polling precinct, the name of the county, the date of the election and the name and official designation of the clerk furnishing the tickets; and one of the judges of election was required to write his name or initials upon the back of each ballot, and directly under the impression of the official stamp. Sections 110, 119, Ch. 80, Sess. Laws 1890.

In all three of the precincts the name or initials of a judge of election does not appear on any of the ballots voted, and at two of the precincts the endorsement of the official ballot was not stamped on the back of any of the ballots, although it was printed or stamped on the face of the ballots. The author-

ity for rejecting these ballots and excluding them from the count rests mainly, if not solely, on the provisions of section 130 of the election law, which says that "in the canvass of the votes any ballot which is not endorsed by the official stamp or has not the name or initials of the judge of election, as provided in this act, shall be void and shall not be counted." ·

Counsel for the defendant insists that this act may be so construed as to permit a ballot to be counted which has either one of these endorsements, the official stamp, or the name or initials of the judge of election. Courts have been extremely cautious in construing the Australian ballot law in such a manner as not to disfranchise the voter, where the omission is not through his own fault, and any construction which will uphold the ballot and secure its count is seemingly upheld, though the reasons therefor are not always very satisfactory. The statute of Minnesota provided that the initials of two of the judges of election of opposite political parties should be endorsed on the ballot. ·

It was held that where there was no wilful disregard of the statute, and no wrong or fraud intended or perpetrated, that the requirement was not mandatory, but was complied with if the initials were those of two judges of the same political faith. But this was mainly upon the ground that the statute though requiring the endorsement on the ballot by two judges of opposite political affiliations did not say expressly that a ballot not containing such endorsement should not be counted, although it did say that "no ballot which had not the initials of two judges of election in said judges' own handwriting on the back thereof," shall be placed in the box. The reasoning of the court is not quite clear, as it seems that the statute, strictly construed, would mean that no ballot should be deposited in the box unless it be the identical ballot handed to the voter by the election officer, upon which should appear the initials of two judges of election of opposite political faith. State v. Gay, 59 Minn., 6. In the case of Boyd v. Mills, 53 Kan., 594, 25 L. R. A., 486, the Supreme Court of Kansas decides a case more nearly in point. The statute of that State provided that the "ballots shall be on plain white

paper through which the printing or writing cannot be read." Sample ballots printed on paper of any color but white are directed by the statute of Kansas to be printed and distributed through certain officers for the inspection of candidates and their agents, and these are exact copies of the official ballots printed on white paper. The statute of that State further provided that "no ballot without the official endorsement shall be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this act shall be counted." In one precinct all the ballots cast were yellow sample ballots, and yet the Supreme Court held that such ballots should be counted, on the ground that the statute nowhere "explicitly" provided that a ballot printed on paper of a color other than white shall not be counted. With all due deference to the learned court, I think that the only ballot provided for as the official ballot, following the letter of the law, was one printed on white paper.

These provisions from Kansas and Minnesota are recent ones and illustrate the extreme reluctance on the part of the courts to so construe the Australian Ballot Law as to deprive any elector of his vote, or of the right to have his vote counted as cast, when the fault is not his own, but that of the election officers. I cite these cases as showing how liberally the statutes are construed in favor of the voter and against a strict construction that would result in disfranchisement.

If these two cases were taken as guides in construing section 130 of our election law, supra, it seems to me that if the ballot contains the "endorsement" of the official stamp alone, even if it were not placed upon the proper part of the ballot, that the law would be technically complied with, and the ballots should be counted. The court said in Boyd v. Mills, supra, "We reach the conclusion that the law has not been substantially infringed because we are unable to see how the purpose of the act can have been impaired in any degree by the mistake made in using the colored ballots." True, the opinion contains some deductions which might be considered as supporting the views of the majority of the court in this case, on abstract questions of the law, but this closing extract

of the opinion shows the true reason for the decision. I am inclined to the view that the construction of the section should be such as to uphold the legality of the ballots, inasmuch as the disjunctive conjunction "or" is used in two places in section 130, and the ballot must have one of three endorsements, either that of the official stamp, "or" the name, "or" the initials of the judge of election. I should not be content to rest my view of the case on this matter alone, as the use of the words "or" and "and" are so loose and so frequently inaccurate, that their strict meaning is more readily departed from than that of any other words, and one is read in place of the other in deference to the meaning of the context. Sutherland Stat. Const., sec. 252.

But the next section, 131, of the law must be read with its predecessor quoted herein. It relates to the canvass of the ballots cast at the election precinct, and provides that as soon as the polls of election shall be closed, the judges of election shall immediately proceed to canvass the vote, and shall continue without adjournment until the canvass is completed, and then follows this provision: "The canvass must commence by a comparison of the poll lists, and they must be made to agree; the ballot box shall then be opened and the ballots counted by the judges and clerks, unopened, and if there are more ballots than names upon the poll list the ballots must be returned to the box, shaken up, and one of the judges shall draw from such box ballots enough to make the remainder agree with the poll list, which ballots so drawn shall be destroyed, and two or more ballots being found so folded as to bear the appearance of having been voted by one person, shall not be counted, but preserved with the poll books; the poll list and ballots being made to agree, the judges and clerks shall then proceed to count and ascertain the number of votes for each person named upon such ballots." It appears to me that this section is either inconsistent with the one preceding it, or if construed with it, as it must be, effectually neutralizes the provisions of the other. Nothing is said in this section 131 about not counting the ballots denounced in section 130, but only those ballots may

be destroyed when there is an excess of ballots over the legal number of votes cast as shown by the poll lists, and the only ballot that "shall not be counted" is a ballot containing two or more votes folded so as to bear the appearance of having been voted by one person. This section 131 utterly negatives the idea of examining the endorsement on the ballot, because if that only could be looked to, the ballot containing the doubtful vote would be counted, if properly endorsed, as required by section 130, while the others enclosed within would not be. Under section 131 all the ballots, those enclosed with the ballot, and the enclosing ballot itself, shall not be counted. By this section, no ballots are denounced, but all must be counted, except those drawn from the ballot box to make the number of ballots correspond with the number of voters on the poll list, and ballots enclosing others. If these sections are inconsistent, under well known canons of construction, the last section in number or position under some authorities must prevail. Sutherland Stat. Const., sec. 220. At any rate, there would be such a conflict that the sections would be held to neutralize each other, as the legislature has uno flatu enacted a contradiction. Perhaps a construction of both of these sections ought to be given, so as to exclude all ballots not properly endorsed, only where there is an excess of ballots, but it is doubtful if this could be done without rendering nugatory section 131. The safest way, in my judgment, is where, as in this case, there is no pretense of fraud in the action of voters or election officials, the presumption must be that all of the ballots cast were received from the election judges by the voters and returned after having been prepared were received by the judges and should be counted. This is the main purpose of these sections, that the elector shall vote only the ticket he has received from the judge of election, and only such tickets shall be counted. The law prescribes minutely the duties of the electors and of the election judges. Cards of instruction printed in English, in clear type, and posted in the election booths, are provided for the voters, and these contain the directions to the voters, how to get the ballot —that is, from a judge of election—how to prepare it for

voting, to vote no other than that received, and to fold the
ballot so that the endorsement made by an election judge
may be seen, before the ticket is voted. In the majority
opinion some stress is laid upon this last direction to the
voter, but I do not think it applies here, as there was some
sort of an endorsement on the ballot, or one of the endorse-
ments, the official stamp stating that it was the official ballot,
etc., and I think that an elector might presume that this was
all of the endorsement required, as his attention in the cards
of instruction and the sections of the law therein copied, is
not called to the full endorsement. Nowhere in the law is
he required to see that the proper endorsement is made, but
only to fold his ticket so as to show the endorsement. In
the case of the ballots in the two precincts where the stamp
was placed on the face of the ballot, I think it should be pre-
sumed, in the absence of any showing to the contrary, that
it was on the margin or at the side, and that the voter obeyed
the injunction to fold it so as to disclose the endorsement
without revealing the ballot as prepared by him. It seems to
me that there must have been some purpose in the part of this
legislation providing for such minute directions to the voter
and in bringing home to his notice what he should do in ob-
taining, preparing and delivering his ballot to the election
officials, in which all of his duties are specifically defined.
When he has complied with these, this is all that may be re-
quired of him. Surely, in all of these directions given to him,
nothing is said about the extreme care he is to exercise, ac-
cording to the majority opinion, in seeing whether the name
or initials of a judge of election is on the ballot, but the deci-
sion of this court adds another duty not imposed by the law
and not brought home to his notice by the instructions given
to him pursuant to law, the duty of scrutinizing the ballot
to see if the proper endorsement is made thereon. It is said
in the majority opinion: "It is little trouble to ask them (the
judges of election) to endorse the ballot properly. We have
no patience to consider the idea that the voters generally have
not the intelligence to do this." Yet it seems that the judges
of election, who must be electors, did not have such "intelli-

gence," for they did not endorse or see to the endorsement of their own ballots, if they voted at all, or those of the electors generally, in strict compliance with the law. They had the law which must be furnished them for their guidance, but the elector had nothing but the card of instructions required by law to be posted in his booth to guide him, and this does not call his attention to the fact that the name or initials of a judge must be on the ballot. Shall the law mock a voter? Shall he be told minutely what to do by a card of instructions for his guidance, and then have his vote rejected because he has not complied with another part of the law which relates solely to the duties of the sworn officials of the law? Is he to take notice of the duties of an election officer and see that they are performed? As to the endorsement of the ballot, that duty is incumbent upon the county clerk and a judge of an election. If the former neglects something in the stamp, such as the name or number of the precinct or some other part of the endorsement to be stamped on the ballot, is the voter to be held responsible? If the election officers fail in their duties as to their part of the endorsement, is the elector to be blamed?

It was held where one received a majority of the votes cast for the office of township treasurer,—it being contended that he was not the nominee of any party, as the ticket was not properly certified, and he was not therefore entitled to a place thereon, and that such tickets should not be counted,— that the voter finding the ticket upon the ballot could not be required to determine its regularity at his peril. The court said: "This might involve a necessary knowledge of facts difficult to ascertain. He (the elector) may safely rely upon the action of the officers of the law, whom he has the right to suppose have done their duty." Bragdon v. Navarre, 102 Mich., 259. This was the rule contended for by me in my dissenting opinion in the case of State v. Barber, 4 Wyo. It is with much pleasure that I notice that the case of Price v. Lush, 10 Mont., 61, holding to the contrary, which I refused to follow, has been, it is said, "modified," but as the concurring Justice, Judge Hunt, says, "overruled," in a recent case in the same court in which a masterly opinion was delivered

by Mr. Justice De Witt.  Stackpole v. Hallahan (Mont.), 40 Pac., 80.

I see evidences of returning reason in the more recent construction of the Australian ballot laws, and I am confident that the rule I follow in this case will finally be plainly announced by the courts of the country.  The law attempts to prevent former evils in protecting the individual voter from corruption and intimidation, but it should not be so construed as to invite a wholesale disfranchisement of unsuspecting voters, who have relied upon, and who have the right to rely upon, the faithful performance by election officials of the duties imposed upon them.  I can not insist upon the literal interpretation of the ballot law that may deprive any voter duly qualified through the misfeasance, non-feasance or malfeasance of any officials, where the elector has obeyed instructions minutely mapped out for him by the law.  The sole object of the sections of the law quoted from is that the elector shall vote only an official ballot delivered to him by a judge of election, after having prepared it, and in this case it seems to me irresistible that the law was complied with on the part of the elector.  It is difficult to construe, and the most liberal construction should be given to it in order to secure freedom and purity of elections, but not to deprive any elector of his vote through the fault of the election officials. To hold to any other rule would be to sacrifice substance to form, and to have our last estate worse than the first.  It is safe to say that the framers of the Australian ballot law, as it appears in our statutes, many of them men of prominence in the history of the State, never contemplated the wholesale disfranchisement of electors through the negligence of election officers.

I think that they will stand aghast at such an interpretation of their statute.  It may be intimated that without a close adherence to the letter of the law, if it can be ascertained, which is to me extremely doubtful, the door to fraud by election officers would be opened, but I think not.  In one case in the books the judges of an election precinct stamped and endorsed according to law official ballots after the polls

closed and cast the ballots themselves, and the names of the
electors on the poll books showed that after the judges and
clerks voted, the electors, strange to say, were recorded in
alphabetical order. Lloyd v. Sullivan, 9 Mont., 577. So it
seems that it is very difficult to prevent corrupt officials from
voting official ballots and endorsing them with all of the
official endorsements required by law, if they desire to do so.
In the case at bar, there is a total absence of fraud, and this is
in effect conceded, as the only matter submitted to us is a
technical non-compliance with certain provisions of the law.
The dangers afforded by the power conferred upon certain
judges under a strict construction and an unreasonable one
of the law, by giving undue prominence to certain clauses of
it, is greater than would be the liberal construction contended
for by me. In one case there is no remedy but the punish-
ment of the judges for failure to endorse properly the official
ballot, and no way to count the vote of the defrauded voters;
in the other, a judicial investigation can be had to determine
the facts and ascertain if fraud actually existed. It is poor
compensation to the people who have been defrauded of their
rights to have the guilty punished when they themselves,
although innocent, must be punished by having their votes
thrown out in the count. I may be pardoned in closing this
branch of the case, to quote, as my brethren have done, from
McCrary on Elections: "Ignorance, inadvertence, mistake or
even intentional wrong on the part of local officials should
not be permitted to disfranchise a district." Sec. 192, citing
Gilleland v. Schuyler, 9 Kans., 569.

However, the case might well be disposed of on other
grounds. The law was enacted before the constitution went
into effect, and, if repugnant to that instrument, must fail,
as only those territorial laws are continued in force that are
not repugnant to the constitution, and if the construction of
the statute adopted by this court is the true one, the law is
invalid. The constitution provides certain qualifications re-
quired of electors, such as age, residence, Federal citizenship,
ability to read and write the English language, and excludes
from the electorate idiots, insane persons, those convicted of

infamous crimes, unless restored to citizenship, and certain electors who are not Federal citizens. The right of suffrage is called "the right to vote," and certain citizens not falling within any of the classes excluded from the suffrage "shall be entitled to vote" at any election. Art. VI, sections 1, 2. This "right," as it is termed by the constitution, "privilege" as it is sometimes called, is sacredly preserved. It can not be sacrificed through the fault or neglect of election officials. The right to vote includes and carries with it the right to have the vote cast, counted; or the right to vote is lost. Where the constitution fixes the qualification of voters, it is not in the power of the legislature either to enlarge or abridge them; but legislation may be enacted which merely regulates the exercise of the elective franchise, and does not amount to a denial of the franchise itself. Cusick's Election, 136 Pa. St., 459. The legislature has full power to regulate the right to vote, but no constitutional power to restrain or abridge the right, or unnecessarily to impede its free exercise. Under the pretense of regulation, the right to suffrage must be left untrammeled by any provisions or even rules of evidence that may injuriously or necessarily impair it, and so the citizen cannot forfeit the right except by his own neglect or by such peculiar accidents as are not attributable to the law itself: Daggett v. Hudson, 43 O. S., 548. In the note to this case, as found in 54 American Reports, at page 843, the language of Coulter, J., in Brown v. Hummel, 6 Pa. St., 80, is cited, and I repeat it: ."The most important of all our franchises— the right of an elector and citizen—cannot in a confined sense, be called property. It is not assets to pay debts, nor does it descend to the heir or administrator. But who does not feel its value, and who but would not turn pale if he thought he could be deprived of it, without hearing or trial, by act of assembly?" In New York, a case arose where the officials charged with the duty of preparing the ballots omitted the name of an office which under the law was to be filled at the election for which the ballot was prepared, and it was held that the voter might write or paste thereon the name of such office and of the person for whom he desired to vote as the

incumbent thereof. The court well says: "The constitution confers upon every citizen meeting the requirements specified therein the right to vote at elections for all offices that are elective by the people, and there is no power in the legislature to take away the right so conferred. The legislature may prescribe regulations for ascertaining the citizens who shall be entitled to exercise the right of suffrage, for that power is given to it by the constitution. In prescribing regulations for that purpose, or in respect to voting by ballot, it does so subject to, and, presumably, in furtherance of the constitutional right, and its enactments are to be construed in the broadest spirit of securing to all citizens, possessing the necessary qualifications, the right freely to cast their ballots for offices to be filled by election, and the right to have those ballots, when cast in compliance with the law, received and fairly counted. Legislation which fails in such respects and prevents the full exercise of the right as secured by the constitution is invalid." People v. Pres't and Board of Trustees of Wappinger Falls, 144 N. Y., 616. Many of the cases are collected to the note to the case of Daggett v. Hudson, in 54 Am. Rep., at page 843, and to them may be added White v. Commissioners of Multnomah County, 13 Ore., 317; Kellogg v. Hickman, 12 Colorado, 256, 260; Kirk v. Rhoades, 46 Cal., 405; Eaton v. Brown, 96 Cal., 371; 17 L. R. A., 697.

In the case at bar, if the law operates to disfranchise any elector and prevents ballots cast by the elector, received by him from the election judges, from being counted, whether properly endorsed or not, in the absence of fraud, is repugnant to the constitution.

I believe that an "honest ballot and a fair count" is secured by the constitution, and that no law, whether adopted prior or subsequent to the time of the taking effect of the constitution, can step between the voter and the constitution, and that any requirement of any statute that adds to the qualifications of suffrage as enumerated in the constitution itself is void, particularly when it is attempted to impose upon a qualified voter such additional qualifications or restrictions as to make the

right of suffrage dependent upon the whim, dishonesty, inefficiency, ignorance or inadvertence of any election officer.

All the disputed ballots should be counted, and judgment rendered for the defendant, and the district court for Converse County should be so advised.

---

### ON REHEARING.

CONAWAY, JUSTICE.

The principal questions now called to our attention arise upon the provision of section 130 of Chap. 80, session laws of 1890, in regard to the rejection of ballots: "In the canvass of the votes any ballot which is not endorsed by the official stamp or has not the name or initials of the judge of election as provided in this act, shall be void and shall not be counted."

1. It is urged that this may be construed to mean that "In the canvass of the votes any ballot which is not endorsed by the official stamp and has not the name or initials of the judge of election, as provided in this act, shall be void and shall not be counted," thus requiring the absence of both the stamp and the name or initials to authorize the rejection of a ballot. It is true that some courts have gone to the extent of construing "or" to mean "and" in order to carry out the plain intent of the legislature; but, as shown in the opinion handed down on the first hearing, the whole tenor of the act in which this provision occurs shows that the legislature meant what is expressed.

The following example was given in argument in illustration of the use sometimes made of the word "or:" "Any person who is not a citizen of the United States or has not declared his intention to become such is not entitled to vote." As to this it is to be said that any author using this language would be saying what he did not mean. The evident meaning is that "any person who is not a, citizen of the United States and has not declared his intention to become such is not entitled to vote." The evident intention is to say that both dis-

qualifications are required to deprive one of the right to vote. But in the provision under consideration, requiring the rejection of ballots, our legislature has expressed its evident intention in apt language. The provision is in plain, terse and mandatory words; it is not for the courts to question its wisdom or propriety.

2. It is further contended that the provision of section 130, requiring the rejection of ballots, is in conflict with part of the next section of the act upon the same subject. The next section is as follows: "Sec. 131. As soon as the polls of the election shall be closed the judges shall proceed immediately to canvass the vote given, and shall continue without adjournment until the canvass is completed. The canvass must commence by a comparison of the poll lists, and they must be made to agree; the ballot box shall then be opened and the ballots counted by the judges and clerks, unopened, and if there are more ballots than names upon the poll list, the ballots must be returned to the box, shaken up, and one of the judges shall draw from such box ballots enough to make the remainder agree with the poll list, which ballots so drawn shall be destroyed, and two or more ballots being found so folded as to bear the appearance of having been voted by one person, shall not be counted, but preserved with the poll books; the poll list and ballots being made to agree, the judges and clerks shall then proceed to count and ascertain the number of votes for each person named upon such ballots." This section contains, in substance, the usual provisions authorizing and requiring the proper officers to canvass the vote. So far as the cases have fallen under our observation or been called to our attention, such provisions have not been held to conflict with other provisions requiring the rejection of other ballots than those specified, nor to require the counting of illegal or void ballots. It is the duty of the courts to so construe the provisions of a statute that they may all stand and have effect, if this can be done by a reasonable construction. Section 130 provides that any ballot which is not endorsed by the official stamp or has not the name or initials of the judge of election as provided by this act, shall be void and

shall not be counted.  Section 131 provides that two or more ballots being found so folded as to bear the appearance of having been voted by one person shall not be counted.  These provisions are not conflicting, but easily stand together without the aid of construction; and we are not of the opinion that the general language of the concluding clause of section 131, requiring the canvassers to count the votes, require the counting of votes contained in illegal or void ballots, or ballots which other statutory provisions require to be rejected.

3.  It is further contended that the provision quoted from section 130 is repugnant to the constitution because its enforcement will result in the rejection of ballots of persons having the constitutional qualifications of electors.  So far as we are at present advised, assisted by the diligent research of counsel, there are, up to this time, but two authorities holding that a statutory provision such as that of section 130 is in conflict with constitutional provisions fixing the qualifications of electors.  And the qualifications of electors are fixed by constitutional provision in every, or nearly every, State in the Union.  It is said that there are one or two exceptions, but we know of none.  (6 Am. & Eng. Enc. Law, 263.)  These two authorities are the dissenting opinion in this case, and the case of Moyer v. Van Devanter, 12 Wash., 377.  These authorities command and receive our respectful consideration.  As to the case of Moyer v. Van Devanter, it is to be remarked that it was decided under statutory and constitutional provisions different from our own.  The ballots drawn in question in that case bore the proper stamp but had not the name or initials of a judge of the election as required by statute.  Another section of the statute makes it a misdemeanor for any inspector or judge of election to deposit in any ballot box any ballot upon which the stamp does not appear.  It is not made a crime to deposit a ballot upon which the initials do not appear.  Our statute punishes as for a felony any election officer who deposits in a ballot box a ballot which has not both the stamp and the name or initials of a judge of the election.  The constitution of the State of Washington provides that "all elections shall be by ballot.  The legislature shall provide for

such method of voting as will secure to every elector absolute secrecy in preparing and depositing his ballot." The constitution of Wyoming contains similar provisions, and, in addition, the following: "The legislature shall provide by law that the names of all candidates for the same office, to be voted for at any election, shall be printed on the same ballot, at public expense, and on election day to be delivered to the voters within the polling place by sworn public officials, and only such ballots so delivered shall be received and counted." This devolves upon our legislature the constitutional duty, and the corresponding constitutional authority, to provide adequate means for identifying the ballots received and counted as those delivered to the voters within the polling place by sworn public officials, and to provide by statute the means to secure the constitutional result that only such ballots so delivered shall be received and counted. If the legislature may not provide the means, it cannot secure the result. In the statute now attacked as unconstitutional such means are provided. And nowhere else is any provision made prohibiting the counting of ballots not delivered by sworn public officials. Nowhere else is a method provided for identifying the ballot offered by the elector as the one furnished him by the election officers in the polling place. But the doctrine of the case of Moyer v. Van Devanter, supra, is clearly against the great weight of authority. The result of a consideration of the cases is well summed up in these words: "These statutes being designed to preserve the secrecy of the ballot and to prevent fraud, will generally be considered mandatory; and this will be so in all cases where the statute provides that a ballot varying from the requirements of the law shall not be counted; but if this provision is lacking; while it is the duty of the election officers to refuse to receive the ballots, if the deviations from the law are manifest; if they have been received they should not be rejected if the variations are trifling." (6 Am. & Eng. Enc. Law, 349.) And this is in accordance with Judge McCrary's view of the law, although from a quotation from Gilleland v. Schuyler, 9 Kan., 569, contained in the dissenting opinion in this case, a different

inference might be made. McCrary's text leaves no room for doubt as to his view, and little room to question that his view is correct. Perhaps no better discussion of this branch of the law can be found, in brief, than his. He says: "The language of the statute to be construed must be consulted and followed. If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute must so hold, whether the particular act in question goes to the merits, or affects the result of the election, or not. Such a statute is imperative, and all considerations of its policy or impolicy must be addressed to the legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done, within a particular time, or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election.

"Thus it has been held in Missouri that a statute making it the duty of the judges of election to cause to be placed on each ballot the number corresponding with the number of the voter offering the same, and providing that no ballot not numbered shall be counted, is mandatory and must be enforced. Although this doctrine may sometimes result in very great hardship and injustice by depriving the voters of their rights by reason of the negligence or misconduct of the officers of the election, it is, nevertheless, difficult to see how any different construction could have been placed upon such a statute. Statutes which simply direct the judges of election to number the ballots, without declaring what consequences shall follow if this be not done, may well be held directory only; but where the statute both gives the directions and declares what the consequences of neglecting their observance shall be, there is no room for construction. Such statutes are intended to prevent fraudulent voting; and if the legislature is of the opinion that the general good to be derived from their strict enforcement will more than counterbalance the

evils resulting from the occasional throwing out of votes hon-
estly cast, the courts cannot reconsider the mere question of
policy. The legislative will upon such a subject, when clearly
expressed, must prevail." McCrary on Elections, secs. 190
and 191.

And the qualifications of electors are fixed by the constitu-
tion in Missouri. The rule in Kansas, announced in Jones v.
The State, 1 Kan., 273, and approved in Gilleland v. Schuyler,
9 Kan., 569, and quoted by McCrary, is stated in these
words: "Unless a fair consideration of the statute shows that
the legislature intended compliance with the provisions in
relation to the manner to be essential to the validity of the
proceedings, it is to be regarded as directory merely." And
the qualifications of electors are fixed by the constitution in
Kansas. The case of Lloyd v. Sullivan, 9 Mont., 577, is cited
in the dissenting opinion in this case. It was a case of fraud-
ulent misconduct of election officers, and the return of the
vote of a precinct was rejected and the entire vote of the
precinct lost on account of such misconduct. And the quali-
fications of electors are fixed by the constitution in Montana.

In Michigan, statutory provisions for securing the secrecy
of the ballot are held mandatory without a statute, that when
those provisions are disregarded the ballots shall be void or
shall not be counted. Attorney General ex rel. Leavitt v.
McQuade, 94 Mich., 439. And in Michigan the qualifications
of electors are fixed by the constitution.

In Nebraska, the indorsement of a name which is not the
name of a judge of the election upon a ballot causes its rejec-
tion in the count, without any express statutory provision to
that effect. Spurgin v. Thompson, 37 Neb., 39. And in
Nebraska the qualifications of electors are fixed by the consti-
tution.

In Texas, a law was passed in accordance with a constitu-
tional requirement that ballots should be numbered. The
law further provided that ballots not numbered should not be
counted: Held, mandatory. State v. Connor, 86 Tex., 133.
And in Texas the qualifications of electors are fixed by the
constitution.

We will not attempt a citation of the numerous cases in which the votes, not only of individual electors, but of entire precincts and entire elections, have been lost solely through the misconduct of election officers. The rule to be derived from the cases is correctly stated in Payne on Elections, sec. 502. "Many irregularities, of frequent occurrence, involving the performance, or omission, of acts not touching the essential validity of the election, are held to be insufficient to justify the rejection of the poll, unless committed in violation of statutes mandatory in form."

In Moyer v. Van Devanter, supra, and in the dissenting opinion in the case at bar, it is held that omissions in violation of statutes mandatory in form are not sufficient to justify the rejection of the poll or ballot, but that such statutes are unconstitutional. These authorities are entitled to and receive our respectful consideration. We will not disregard them on the sole ground that they are opposed to the great weight of authority. The principal reason urged in support of these opinions is the hardship and injustice of depriving the voters of their right by reason of the negligence or misconduct of election officers. McCrary answers this in the quotation already given: "Such statutes are intended to prevent fraudulent voting, and if the legislature is of the opinion that the general good to be derived from their strict enforcement will more than counteract the evils resulting from the occasional throwing out of votes honestly cast, the courts can not reconsider the mere question of policy. The legislative will upon such a subject, when clearly expressed, must prevail."

But in the case at bar some question is made in the dissenting opinion as to the intention of the legislature in enacting the statute in question. It is there said: "It is safe to say that the framers of the Australian ballot law, many of them men of prominence in the history of the State, never contemplated the wholesale disfranchisement of electors through the negligence of election officers. I think they will stand aghast at such an interpretation of their statute." As to this it is only necessary to say that our legislators have expressed their

intention, in language too plain for interpretation or construction, that some ballots shall be void and shall not be counted. It is not material on this point whether the ballots in question in this case are such ballots or not. When, in any case, ballots from any precinct, or from any number of precincts, come within the description of ballots which these prominent legislators have declared shall be void and shall not be counted, and when they stand aghast at the result, they can only reflect that the work is their own and not that of the courts. After thus appealing to the intention of the legislators, the dissenting opinion insists that such intention, whatever it may be, shall be utterly disregarded and set at naught as unconstitutional. Into such inconsistencies are able and ingenious jurists driven in attempting to defend indefensible positions.

The statutory provisions under consideration are part of an act of the last territorial legislature, consisting of 184 sections, entitled elections, approved March 14, 1890. At that time the constitution had been ratified by popular vote by an overwhelming majority. That legislature, fresh from the people who had so recently ratified the constitution, enacted this law. It is safe to say that the members of this legislature did not regard as unconstitutional the provision that certain ballots should be void and should not be counted. The first State legislature re-enacted, generally, all the statutory law of the territory not repugnant to the constitution. (Sess. Laws 1891, p. 157.) This legislature also amended the election law in some particulars, but in no point affecting the decision of the questions reserved in this case. The second State legislature did not amend this law in any particular. The third State legislature amended the election law in some of its provisions, but not in any point affecting the questions under consideration. These successive legislatures left in force section 119, that "before delivering any ballot to an elector the said judges shall print on the back and near the top of the ballot, with a rubber or other stamp provided for the purpose, the designation 'official ballot,' and the other words on the official stamp as hereinafter provided, and one

of the said judges shall write his name or initials upon the back of each ballot, and directly under the said official stamp." They left in force section 118, providing that "No judge of election shall deposit in any ballot box any ballot upon which the official endorsement does not appear." They left in force section 164, providing that "no officer shall deposit in the ballot box any ballot except a lawful one. A lawful ballot is an official ballot officially stamped and marked with the initials or name of a judge of the election and offered by a qualified elector during the time of election." They left in force section 130, providing that "In the canvass of the votes any ballot which is not indorsed by the official stamp or has not the name or initials of the judge of election, as provided in this act, shall be void and shall not be counted."

It is safe to say that these successive legislatures in preserving these sections did not think that they were violating the constitution, or impairing the constitutional rights of electors. It is safe to say that they intended these provisions to have effect and to be enforced, and that the prohibited ballots should not be counted. And while they were doing this, so far as we have been able to ascertain, assisted by the diligent research of counsel and of the dissenting justice, there could not be found a decision of any court or an opinion of any judge denying the constitutional authority of the legislature of a State to pass a law defining a lawful ballot, and prohibiting the counting of ballots which are not lawful. These provisions, and the entire system of voting known as the Australian ballot law, are intended to prevent fraud. It is poor consolation to the honest voter to cast his vote and have it counted when he knows it may be offset by a purchased vote. It is poor consolation to the majority of honest voters of a populous district to cast their votes and have them counted when they know that their majority will be met and overwhelmed by the votes of hordes of hired ruffians and repeaters. It is poor consolation to them to go into court for a remedy, and vainly attempt to get evidence of frauds which are notorious, while the successful criminals are laughing at their futile efforts. It is notorious in the recent his-

tory of the country that such frauds, committed with impunity, were attaining such enormous proportions and were becoming so habitual, that thoughtful patriots believed that the foundation of popular government was being undermined and its perpetuity threatened, and all the while there were laws upon the statute books for the punishment of such crimes; all the while laws were in force and the courts were open for the correction of the results of these crimes by which the popular will was defeated. And all the while the successful conspirators were carrying out their nefarious schemes with effect, educating hordes of retainers in venality and corruption, defying the popular will, and challenging the better elements of society with the self-convicting question, expressed generally in action, but sometimes in words: "What are you going to do about it?" This is no imaginary picture. Words fail in adequately depicting the reality in its true colors. The controlling principle in the operation of these enemies of popular government, so long expressed in their actions, and so long and so successfully carried into effect, has recently been confessed and proclaimed in clarion tones in the constitutional convention of South Carolina by the honorable member from Berkeley in these words: "We do not want fair elections!"

Evils of this nature, so monstrous in older communities, were threatening Wyoming. Wyoming does want fair elections. Legislators, truly prominent in the history of the State, men of integrity and ability, have devoted their best thought to devising and perfecting a plan to meet and crush such frauds in their inception. Prevention is better than attempted cure. The result of their sustained and persistent labor is the present election law. By this law, Wyoming, through four successive legislatures, has said that she does want fair elections. This law is her answer to the question, "What are you going to do about it?"

One provision of this law was considered so essential to the prevention of fraud, bribery, intimidation and corruption, that it is put in language expressly mandatory. It specifies certain ballots which shall be void and shall not be counted. This provision is attacked as repugnant to the constitution.

We are asked to declare it so by what we must regard as an innovation in the law of statutory construction, opposed to the great weight of authority, and without foundation in sound reason. The distinguishing feature of this statute, as compared with former election laws, is the prevention of fraud. The construction contended for would destroy this feature. It would relegate the wronged and defrauded public entirely to the old remedies by criminal actions and election contests, prosecuted after the harm was done. These were the remedies which so often, and for so long a time, proved inefficient, and which the legislature has endeavored to supplement by efficient preventive measures. The fear of punishment has never been found to be an efficient safeguard against political crimes. Let it once be known that the most mandatory provisions of our election law may be disregarded, and then there is at once destroyed all the security for the purity of elections which the law furnishes above former laws. Nothing more is required for the destruction of the barriers which Wyoming has erected for the protection of the honest verdict of her legal electors as expressed at the polls against the machinations of political tricksters and criminals. Nothing more is necessary to reopen the floodgates of fraud. Nothing more is necessary to restore the old order of things under which, in older communities, crime has reared aloft its brazen front in the sight of all the world; has defiantly stalked abroad in the light of the noonday sun; has placed its minions in positions of power, of trust, of honor, and of profit; has educated its votaries to regard crime as honorable, and to think and expect that successful crime should be abundantly rewarded.

The legislators of Wyoming have done their work carefully, and, it would seem, wisely and well. That it is satisfactory to the people is evidenced by their preserving every distinguishing feature of the work after repeated tests in its practical operation, and repeated opportunities to repeal or modify it through their legislators. But this is straying from the question. Is the law constitutional? From considerations

already advanced and authorities already cited, I am of the opinion that it is. The former order of this court will stand.

*Rehearing denied.*

POTTER, J., concurs.

GROESBECK, CHIEF JUSTICE.

I dissent. Since a rehearing was ordered in this case I have seen nothing to change my views as announced upon the original hearing. Indeed, since my opinion was filed, decisions in parallel cases, including some very recent ones, have intrenched my position.

There can be no question that all of the disputed ballots, which were all of the ballots voted at three precincts in Converse County, were honestly cast and honestly counted. There is no imputation or suggestion of fraud in the case, and it is apparent that if the ballots are illegal, they become so through the failure of the judges of election, or some of them, to make or cause to be made all the endorsements thereon mentioned in the act.

The provision of law quoted in the majority opinion was doubtless enacted for the purpose of preventing ballot box stuffing, and the voting of other than the official ballots, not to work a wholesale disfranchisement of honest and unsuspecting voters. "It is one of the great maxims of interpretation, to keep always in view the general scope, object and purpose of the law, rather than its mere letter." Rutledge v. Crawford, 91 Cal., 533. Laws are to be construed according to their spirit and meaning, and not according to their letter. Assuming the constitutionality of a law, before it should be construed to work the disfranchisement of an elector, it must be clear that under the circumstances then existing, the legislature intended such to be the case. "All statutes tending to limit the exercise of the elective franchise by the citizen should be liberally construed in his favor, and unless the ballot comes within the letter of the prohibition against a particular kind of ballot, it should be counted. A great constitutional privilege—the highest under the government—is not to be taken away on a mere technicality, but

the most liberal intendment should be made in support of the elector's action, whenever the application of common sense rules which are applied in other cases will enable the courts to understand and render it effectual." Talcott v. Philbrick, 59 Conn., 485. These extracts are taken from the recent decision in Nevada in the case of Buckner v. Lynip, 41 Pac., 762, where the statute provides that any vote not bearing the water-mark "and" any ballot on which appears names or marks written or printed shall not be counted, and where it was held that ballots should be counted from which the inspector or judge of election failed through ignorance to remove strips bearing the number, though his failure to detach the strips made the ballot capable of identification, and this decision was in the face of positive provisions of the statute. The court was loath to give such a liberal interpretation to the law as to reject these ballots, and it looked to the evident purpose and spirit of the act, very properly holding that the law did not contemplate a sweeping disfranchisement of qualified electors through the carelessness or inefficiency of election judges. This court quotes with approval from other authorities, which are applicable in the case at bar: ."These cases can not all be harmonized, but the general trend thereof has been to recognize a clear distinction between those things required of the individual voter and those imposed upon election officers. There is a disposition to hold the former valid and mandatory; but where there has been a substantial compliance with the law on the part of the individual voter, and it is made to appear that there has been, in fact, an honest expression of the popular will, there is a well defined tendency to sustain the same, although there may have been a failure to comply with some of the specific provisions of the law upon the part of the election officers, or some of them." Moyer v. Van Devanter, 12 Wash., 377. The language of the opinion in the case of Parvin v. Wimberg, 130 Ind., 561, is also quoted with approval by the Nevada court: "A study of the statute upon the subject of elections leaves no doubt that its purpose is to secure a fair expression of the will of the electors of the State, by secret ballot, uninfluenced by bribery, corruption or

fraud. The disfranchisement of whole precincts by reason of an honest mistake on the part of election officials is inconsistent with that purpose." These are golden words, and ought to govern the disposition of this case, for by giving a literal meaning to the law, its very purpose is defeated, and its enforcement is made most grievous to bear. The object of the provision was to identify the votes and to preclude the reception and counting of illegal ballots, but it certainly could never have been intended by the legislature to have the law read so as to practically disfranchise all of the electors of one or more precincts, through the inadvertence or negligence of election officials. Under the decision of this court, it would seem that there is no remedy for the electors who have been deprived of their suffrages, nor for the candidate who has been deprived of his office, for he cannot show by evidence aliunde that these votes were in fact honestly cast and honestly counted. I can not consent to such an interpretation of the law, even if its construction should be what my brethren have made it, as I think it is making the law an engine of oppression, while its aim and object was to suppress fraudulent voting and to secure pure and free elections. Some stress is laid in the majority opinion upon the fact that the law has stood without amendment since its enactment in respect to its provision denouncing certain ballots as void and declaring that they should not be counted. This statement is easily answered. This provision has never before been brought to the attention of the courts of this State for consideration. I mistake the temper of the people of this State if it shall remain unmodified, for I think the construction adopted is abhorrent to reason and is destructive of popular government. No other law would be construed as harshly as this one has been, and no law should be more liberally construed than this one, in order that it may not be a reproach to our jurisprudence and accomplish fraud by seeking to prevent it. Election contests have been rare in this jurisdiction before the passage of this law, but the present act has been, like many new enactments, a fruitful source of contention. It is to be regretted that our young commonwealth is not to take its

place in the van with those States where the Australian ballot
law has received a liberal and broad construction so as to
jealously guard the most sacred of our rights, the right of
every qualified elector to cast one vote, and to have that vote
honestly counted

It was held in Canada, in an early case, in Wigmore on
the Australian Ballot System, at page 194, that although at
a certain polling place none of the ballots deposited had the
initials of the election officers on the back as required by
law, that as the irregularity occurred on all of the ballots,
without reference to a particular candidacy, and was evi-
dently the result merely of the ignorance of the election
officers, the ballots were valid.     Ex parte Tremblay, 13
Queb., L. R. 64 (1887).   It may be that the provincial statute
did not contain the mandatory language of our statute, de-
nouncing such ballots as void and providing that they should
not be counted, but I think this makes but little difference
in principle.    The legislature certainly could never have in-
tended to mean that all of the ballots cast at a polling pre-
cinct should be excluded because they do not contain all of
the indorsements mentioned in the act, where it does not
appear that there was a design to evade the statute or to
effect a fraud on the part of the electors, or in the action or
failure to comply with the provisions of the act on the part
of the judges of election, and where it must be inferred that
such failure to comply with the strict terms of the law was
owing to the carelessness or inadvertence of the judges of
election.   The provision, even though mandatory in its terms,
is not quite clear in denouncing the ballots as illegal for a
lack of all of the indorsements, but a survey of the whole act,
keeping in view the great object in its enactment, makes it
plain that it was never intended to defeat the popular will by
casting out bodily the entire votes of districts by any provi-
sion of the statute.   It was intended to prevent the voting of
any ballot but an official one received from the proper officials
and deposited by the elector who so received it.   It is clear
that none but official ballots were cast and counted, and this
is sufficient, as the statute, however it may be construed, is

but a means to an end, and if the end in view has been attained, that is sufficient. I adopt the views of Judge Peckham, recently promoted to the Supreme Court of the United States, from his dissenting opinion in the case of People v. Board of Canvassers, 129 N. Y., 448, 449: "But a mere inadvertent mistake of an officer ought not to work such an extreme penalty as disfranchisement on innocent electors." "It seems plain to me that those purposes (of the election act) are endangered, if not frustrated, by a construction which in my judgment is unreasonable and unnecessary, and by which thousands of perfectly innocent electors may annually be disfranchised without fault on their part, and the will of the majority be thus set at naught."

The case of Spurgin v. Thompson, 44 N. W., 297, relied upon in the majority opinion, does not go to the extent claimed therein. As I understand the facts in the case, a name appeared written on the ballot which was inferred to be that of an elector, and so it was rejected, and not because the name of the election officer was not thereon.

A review of all the cases bearing upon the construction of statutes similar to ours convinces me that no provision of the act before us should be allowed to operate against the evident object and purpose of the act, and to bring it into contempt and reproach, by making it a means of disfranchisement of whole districts and its technical violation result in the conversion of a minority of electors of a county into a majority. The ballots are delivered to the electors by the judges of election, received again by them and deposited in the ballot box and counted, although, perhaps, not indorsed with all the matters required by the statute, are sufficiently identified as official ballots, and should not be rejected.

2. But the great question at stake in this case is, assuming that the statute is as it is construed by the majority of this court, whether it would be permitted to disfranchise all of the electors of one or more precincts because a judge of election has failed to make certain indorsements upon the ballot, which it is contended are required by the statute, whether it would be constitutional. The case of Moyer v. Van Devanter,

supra, is directly in point. The provisions of the Washington statute are as follows: In the canvass of the votes, any ballot which is not endorsed, as provided in this chapter, by the official stamp and initials shall be void and shall not be counted," etc. The court said: "The failure to comply with the law appears to have been due to the ignorance of its provisions on the part of the election officers. That the prohibition aforesaid against the counting of these votes, under the above circumstances, is an unreasonable one, and in conflict with the right guaranteed by the constitution, seems to us a clear proposition.

"Were we authorized to hold otherwise, such a holding would be subversive of the best interests of society, and might result in great peril to our governmental structure. Such a holding is not necessary to preserve the purity of elections; for provision can be made for the investigation of charges of actual fraud upon the part of electors and election officers. It would be an interminable task to refer to each of the cases cited in detail, and we content ourselves with giving our conclusions drawn from all of them. No decision cited has gone to the extent we are asked to go by the appellant in this case; and to accord with the general holding of the courts, as we understand them, in the light of what has actually been decided in the cases, we are compelled to hold that the provision aforesaid against counting ballots where no initials are placed thereon cannot be sustained."

The court puts the distinction very clearly as to statutes held to be mandatory and constitutional, and those that are not; the former is where the voter is required to do certain things, and is charged with obedience to the regulation, and the latter where certain duties devolve upon election officials, a distinction, I think, the majority of this court have overlooked. The majority opinion states that this decision by the Washington Supreme Court is against the weight of authority. I think not. Neither is it based upon constitutional and statutory provisions differing in any material respect from our own.

The provision of our constitution invoked by the majority

of this court reads as follows: "The legislature shall provide by law that the names of all candidates for the same office, to be voted for at any election, shall be printed on the same ballot, at public expense, and on election day to be delivered to the voters within the polling place by sworn public officials, and only such ballots so delivered shall be received and counted." This provision does not qualify in any manner the other constitutional provisions which grant the right to vote to persons having the qualifications provided in the constitution. It certainly affords no warrant nor authority for the enactment of any law which could be so construed as to exclude the ballot of any qualified elector which has been delivered to him by a sworn public official in the polling place, and which was received from him and deposited in the ballot box by one of the judges and counted by all of them. It is asserted that this provision and the corresponding constitutional authority "to provide adequate means for identifying the ballots received and counted as those delivered to the voters within the polling place by sworn public officials, and to provide by statute the means to secure the constitutional result that only such ballots so delivered shall be received and counted. If the legislature may not provide the means, it cannot secure the result." The legislature undoubtedly may provide the means for identification, but not to such an extent as to deprive the elector of his vote when it appears that he has voted only the ticket received from a judge of election, and that only such votes so received have been counted. It can not deprive the injured electors and the candidates deprived of their votes of any remedy anywhere to prove that the ballots cast and counted were those furnished by the judges and deposited and counted by them. It can not make the right of suffrage dependent, and I use the word advisedly, upon the competency and integrity of the judges of election or any of them.

Our constitutional provision was never intended to cover such a "means of identification" of any ballot as to nullify the popular will, and to establish a triumvirate in each election precinct, which shall hold in its hands the fate of any

election, and whose action or negligence is final and not subject to review. It was never intended by the constitution of this State, or of any State, to substitute for a government of and by the people, a government of and by the election judges. I can not believe that it was the object of any constitutional or statutory provision to thus subvert the popular will, and in the name of "fair elections" to seat a minority candidate for office and to set aside the returns from three precincts to do so, where fraud in the conduct of the election is neither charged nor imputed.

The doctrine I contend for was established in Michigan by the decision in the case of Attorney General v. Detroit, 78 Mich., 545, where the court say: "The object of a registry law, or of any law, to preserve the purity of the ballot box, and to guard against abuses of the elective franchise, is not to prevent any qualified elector from voting, or unnecessarily to hinder or impair his privilege. It is for the purpose of preventing fraudulent voting. In order to prevent fraud at the ballot box, it is proper and legal that all needful rules and regulations be made to that end; but it is not necessary that such rules and regulations shall be so unreasonable and restrictive as to exclude a large number of legal voters from exercising their franchise. Nor can the legislature, in attempting, ostensibly, to prevent fraud, disfranchise legal voters without their own fault or negligence. The power of the legislature in such cases is limited to laws regulating the enjoyment of the right, by facilitating its lawful exercise, and by preventing its abuse. The right to vote must not be impaired by the regulation. It must be regulation, not destruction." After citing a number of authorities, the opinion reads: "These authorities all tend in one direction. They hold that the legislature has the right to reasonably regulate the right of suffrage, as to the manner and time and place of voting, and to provide all necessary and reasonable rules to establish and ascertain by proper proof the right to vote of any person offering his ballot, but has not power to restrain or abridge the right, or unnecessarily to impede its free exercise." And further on, the opinion says: "No elector can

32

lose his right to vote, the highest exercise of a freeman's will, except by his own fault or negligence." It will not do to say that this opinion has no application to the Australian system of voting. In a recent decision of the same court, Todd v. Board of Election Commissioners, 64 N. W., 496, while holding that a law prohibiting the printing on the official ballot of the name of a candidate receiving the nomination of two or more parties in more than one column, is a valid exercise of the power of the legislature to pass laws to preserve the purity of elections and guard the elective franchise, as conferred by the constitution of the State, approved the doctrine in the case of Attorney General v. Detroit, supra, and says: "If the effect of this act, as is strenuously argued by the learned counsel for the relator, is to 'subvert or impede the right to vote,' it is clearly unconstitutional."

It is unnecessary to multiply authorities in support of my position. Their name is legion and their reasoning is unanswerable. The doctrine they establish is imbedded in constitutional provisions which are the pillars that support popular government. The right to vote, the highest exercise of a freeman's will, can not be frittered away by technical violations by election officials of a statute doubtful in its terms, or even where it has the plainest meaning and intent, and the popular will thus set aside and thwarted. Expressions to the contrary, and there are undoubtedly some of them, have never found, and will never find, a permanent lodgment in the jurisprudence of any commonwealth in the Union; for the doctrine they announce is abhorrent to reason, shocks the moral sense, and undermines the foundation of free government. I regret that this court has not fearlessly taken the stand with great tribunals of sister States, in denouncing as unconstitutional any invasion of the great right of suffrage, that inflicts vicarious suffering and punishment upon a body of electors for the sins of omission of their servants. I can not see what bearing the remarks of the honorable member of Berkeley County in the constitutional convention of South Carolina has to do with the question here. If I understand correctly his remarks, as stated in the majority opinion, he desired to see

the will of a majority of the people sacrificed by constitutional restrictions, which would hamper and impede the right to vote of a large class of people. Precisely what he may have desired, has been accomplished here by the disfranchisement of all the voters of three election precincts of a county, through the failure of election officers to comply with asserted strict requirements of the law. "Wyoming does want fair elections." But the people of this State will never consent to have their will as expressed at the ballot box defeated by any construction of a statute nor by any statute which places the election of either local or State officials, or, it may be, a presidential election, in the power of careless or inefficient election officials, from whose action or omission to act there can be no appeal, and whose action is now made final and conclusive. While expressing noble and lofty sentiments upon the subject of fair elections, in which I heartily concur, it seems to me that the majority of this court, after uttering them, proceed to make a fair election the sport of chance and wholly dependent upon the conduct of election officials who preside at each polling precinct, and in whose hands is now lodged an enormous, uncontrolled and uncontrollable power. History will bear me out in saying that these bodies are not always free from partisan and corrupt influences, and that many of the most notorious frauds against the ballot box have been perpetrated by election officials. The temptations to fraud may be great under the law as it is now to be administered, but it will not continue long. A people jealous of their rights will speedily sweep from the statute books the least excuse for thwarting their will as honestly expressed by their ballots. They will free the ballot box from the absolute and arbitrary control of election boards and provide that innocent mistakes of election officials shall not constitute a ground for wholesale disfranchisement.

I may aptly close this opinion by quoting a brief but comprehensive extract from Judge Cooley's great work on Constitutional Limitations, at page 775: "That one entitled to vote shall not be deprived of his privilege by action of the

authorities is a fundamental principle." As to the other matters discussed in my former opinion, I am content to permit them to remain unmodified.

[Decided July 1, 1895. Rehearing denied December 6, 1895.]